### WAGNER v. NATIONAL LIFE INS. CO. OF MONTPELIER, VT.

(Circuit Court of Appeals, Sixth Circuit. November 9, 1898.)

#### No. 497.

1. RELEASE—AVOIDING FOR FRAUD IN ACTION AT LAW—PLEADING.

It is proper, in a suit at law, for the plaintiff to meet a plea of release by a replication that the release was obtained by fraud, whether the fraud is in the execution or in misrepresentation as to material facts inducing execution, where the issue involves simply a question of fraud between the parties.

2. SAME—IMPEACHMENT FOR FRAUD—FALSE STATEMENTS.

To entitle a plaintiff to avoid a release for fraud, in law or equity. because of untrue statements knowingly made by defendant, it must appear—First, that defendant made such statements intending that the plaintiff should act upon them; and, second, that they were a substantial inducement to the execution of the release.

3. SAME.

To render a false statement ground for the avoidance of a release, it must appear, not only that the person who executed the release would not have done so had he been told the truth, but also that he would not have done so had no statement been made.

4. SAME.

The holder of a policy of life insurance determined to surrender it, and obtain its surrender value, at the same time taking a new policy. For the purpose of effecting the change, he went to the office of the agent of the company, where he was examined by its physician, who rejected him as an applicant for new insurance, on the ground that he had an affection of the heart. At the same time, the physician stated to him that the disease was not in itself dangerous, and would not cause his death, but would prevent him from obtaining insurance in any other company, and advised him to retain the policy he then held. The insured, however, surrendered the policy, and he and his wife, who was the beneficiary, executed a release thereon. In fact, his disease, as the physician knew, was likely to cause his death at any time, and did so within a few days thereafter. *Held*, that the wife could not avoid the release because of the false statement made by the physician, which was not the inducement to its execution, nor intended to be so, although, if the physician had stated the truth within his knowledge, it might have prevented the surrender of the policy.

5. SAME—EXECUTION WITHOUT READING.

The beneficiary of a policy of life insurance, who executed to the company a release of liability thereon upon its surrender, cannot avoid such release on the ground that she signed it without reading, at the instance of her husband, who was the insured, and in the belief that it was merely a receipt for accrued earnings. and left the policy in force, where she was able to read. and no fraud was practiced upon her by the company or its agent.

In Error to the Circuit Court of the United States for the Eastern District of Michigan.

This action was brought by Mary L. Wagner against the National Life Insurance Company of Montpelier, Vt., to recover $5,000 upon a policy of life insurance issued upon the life of her husband, Robert Wagner. Robert Wagner died on the 10th day of December, 1894, and after due proof of loss and refusal to pay by the company, the writ was issued and the declaration filed. The defendant filed a plea of the general issue, and, as the Michigan practice requires, gave notice of an intention to prove a surrender of the policy in bar of the action. The plaintiff offered in evidence the policy, which, at the request of plaintiff, had been produced by the defendant, in whose possession it was. The defendant objected to the introduction of the policy, for the reason that it bore the following indorsement:

"Detroit, November 26, 1894.

"Received from the National Life Insurance Company $1,060.61 in full for all claims under this policy, No. 45,801, now terminated by surrender for cash.
    "[Signed]                            Robert Wagner.
                                         "Mary L. Wagner.

"In presence of
"McC. C. Le Beau."

The policy was admitted in evidence, subject to objection and exception. The only witnesses to the surrender and the accompanying circumstances were Mrs. Wagner, called in her own behalf, and Le Beau, the agent, and Dr. Miner, the medical examiner, called by the company. Mrs. Wagner was permitted to testify to a conversation with her husband before going to the agent's office. She said: "He asked me if I would be willing to let him have the accrued money on his life insurance; if I were willing he should have this money; that would help him out of some financial difficulty. And I remarked to him at the time, as we went towards Mr. Le Beau's building, 'You do not intend to drop your insurance, do you?' And he answered me very impetuously, as he would if he thought I misunderstood him, and he said: 'No; not at all. I have not the slightest idea of doing such a thing. I simply want you to give me the interest or accrued money; that is all I want. Your life insurance will go on just the same.' And it was then I said, 'Very well, that is all I ask.' I did not mean to ask a foolish question; I simply wanted to be satisfied; and we entered the building, and from that moment I was under that supposition. I never doubted it again. I did not question the thing afterwards as I might have done." The witness then described the conversation of the agent, Le Beau, and the physician, Dr. Miner, with Wagner, after the medical examination. She said: "They both came out of the room together. I don't remember anything that they said particularly to me. They said to Mr. Wagner: 'Well, Mr. Wagner, are you fully resolved to do this thing? Have you made up your mind to do this thing?' I think Mr. Le Beau asked him that question, if he wanted to do this; of course, as I supposed— (Objected to.) Q. What did Mr. Wagner say? A. He said, 'Yes,' he did. Then Mr. Le Beau told him to come into the room,—this private room,—and they would settle matters up; and the three went in together. I cannot remember how long they were in there. The next one I saw, I think, must have been Mr. Le Beau. He came out of the room with a folded document in his hand. The document was folded like this. And he stood in front of me, and asked me my name. 'Your name is Mary L. Wagner?' he said; and I said, 'Yes;' and he said, 'Will you please sign here, Mrs. Wagner?' And I signed the document where he indicated, and I did not look at anybody else, and I had not looked at anybody else, except Mr. Wagner. After signing, I looked up and saw Mr. Wagner's condition, which very much frightened and astonished me. I saw that something dreadful had happened. I was positive of that when I saw his face. I knew him well enough to know when he was excited; that he would look like that only under very strange circumstances. Large beads of perspiration were on his forehead, his eyes were set, and his color was gone; and I knew he was very much excited to be in such a state as that. Then I

asked him what was the matter, 'What does all this mean?' And he replied, 'They won't give me any more insurance;' but he just muttered the words; and then Mr. Le Beau and Dr. Miner told me why they would not give him any more, and they went into the particulars of the case. They went into the particulars of the condition of his heart; told me that it was enlarged, and that his life was not a good one, that they could not insure it; and Dr. Miner used all the medical terms such as are used in describing the conditions of a person's heart. I cannot remember those. I know he went into all the particulars of this thing every way; told me how he was. I was very much astonished and excited to think he would do such a thing to a man who was already just crazy with excitement, being told such a thing: and I tried to finish the business arrangements just as quickly as I could, and get him out of there. That was my idea,—to get him out of there as quickly as possible. And I said, 'Mr. Le Beau, if you cannot insure Mr. Wagner, there are other companies that will.' And he remarked. 'No,' his case was not a good one, it was utterly impossible to overcome that verdict; the reports would go all over the country, that it was a report that every company would hear of; that he would not be taken again. And then, in order to say something and get away. I said, 'All right, if he cannot be insured, perhaps I can get my life insured;' and I got him out of there as soon as I could. I saw that he was not fit to speak to; that I could not talk to him; and I did not try to say a word. We got on the elevator, and came down, and I did not say anything to him until we got home." The next day, Mr. Wagner applied to Mr. Le Beau to withdraw the surrender, and Mr. Le Beau said it was too late for him to act in the matter, and that he would refer the matter to the company, which he did, and the company declined to reinstate Wagner. Wagner's death from heart disease occurred within 10 days from the date of the surrender. The check was duly tendered to the company before suit brought.

The account given by the agent of the company, Le Beau, was as follows: "Mr. Wagner first spoke to me about the matters in question in this suit about the 18th or 20th of August, 1894, in my office. I was at that time state agent for the defendant company. He told me then that, when his policy became due, he should surrender for cash. The matter next came up, as I recall it, on the morning of the 26th of November, between ten and eleven o'clock. He said that he had come to fix that matter up. He had got to surrender. I stated to him I thought it was a most peculiar proceeding for a man in his condition. It was easily seen he was in a very bad condition. and I told him it was a peculiar proceeding for him to come to an insurance office and surrender his life insurance. He made the statement that he was not feeling very well; that he had been to a wedding on Saturday night. I think he said his own son was married at Cleveland, and he was up pretty late, and had had a sinking spell. I told him I thought so: he had that appearance. He said he would be all right in a day or two. I says. 'Mr. Wagner, that is the most absurd thing, the most foolish thing. I can imagine.' 'Well,' he said, 'I have got to have it. I have made my arrangements for it, and I have got to have it.' Then I says, 'Now, Mr. Wagner, if you insist upon this matter, you had better make application for some term or cheap insurance to protect your family in the meantime.' Well, he wanted to know what it would cost. Of course, the premium he was paying was high,—some three hundred and odd dollars. I told him the price, and he said, 'All right, I will do that.' I was as well aware then as now that he could not get insurance, but I had an idea that it would appease his desire, and withdraw him from that policy. When I returned from dinner, the doctor had examined him. * * * I called Mr. Wagner in, and told him the doctor said it would be impossible to write him any more insurance, and the best thing he could do was to keep what he had. And he said he could not do it. And I said, 'Wagner, I would mortgage my farm in order to do it.' I said, 'I would rather pay your family $5,000 in a year than to pay your cash surrender now.' And he says, 'It don't make any difference; one thousand five hundred dollars is worth more to me now than five thousand dollars will be in two or three years.' And there was no further argument. I saw there was nothing I could do that would induce him to with-

draw his determination. Thereupon I told him, 'If you are determined upon surrendering this, call Mrs. Wagner.' * * * His wife was there with him; so he stepped to the door, and he called her in my office. I sat down, and filled out the discharge, and had Mr. Wagner sign it, and asked her to sign it. She took my chair in my private office, after which she turned in the chair to her husband, and she said, 'Now, Robert, you haven't got any other insurance?' He says, 'Yes, I have got a two thousand dollar policy here, and two thousand dollar policy over there in the Equitable,' pointing across the way. Something came up whereby Mrs. Wagner— I think she asked the question why they would not insure, or if we would insure her. I asked her how old she was. And she told me, and I put another question to her, and she answered it, and I told her we could not insure her. She wanted to know why. I told her the rules of the company applicable to women would not allow it. Afterwards I drew the check, and gave it to Mr. Wagner. Mr. Wagner took the check, and went out."

The medical examiner, Dr. Miner, who was the only other witness, gave the following testimony: "Well, upon examining him, I found Mr. Wagner's pulse very weak and very irregular. I then examined his chest, and found he had enlargement of the heart. It was enlarged from half an inch to an inch, so that the apex beat,—that is, the part where the heart strikes on the chest,—instead of beating in its normal position, was from an inch to an inch and a half to the left, and down about half an inch, which is indicative of enlargement of the heart. I also found a slight murmur or blowing sound, that shows the valves of the heart do not close properly. In other words, he had valvular lesion, enlargement of the heart. * * * So, I finished making my examination; and then I opened the door, and I saw Mr. Le Beau, and I called him in, and I says, 'We can't take this man; we cannot take Mr. Wagner.' And he says, 'Why not?' I says, 'He has a heart trouble, and he is not a good risk.' * * * And then Mr. Le Beau said that I would have to pass upon Mr. Wagner's risk at once, because, if he were not a good risk, it would not be proper to let him give up the policy he then had. * * * So he called in Mr. Wagner, and told him. He said that I didn't find him just right. And then I said to Mr. Wagner: 'I see you are worried about this. It is unnecessary. Your condition of the heart is not a condition of the heart that will ever kill you. You may live just as long or longer than I or any other man.' Then he says: 'What is the trouble with it?' And I says: 'Nothing, only this; the insurance companies do not accept any risks where there is an affection of the heart or kidneys, unless it may be what is called functional trouble; that is, not consequent upon any condition of the heart or interferes with its action, but it must be an organic condition that may produce death at any time.' 'Now,' I said, 'you will live just as long as any other man; but, if you happen to get pneumonia or typhoid fever, your condition of the heart is one that will have to be considered. It may be serious, and it may not, but that is about the only trouble you will ever have from your heart. Don't give it any concern whatsoever.' That was not true what I told him, as it was a condition he should be concerned about, and it was a condition of the heart that was apt to be followed by sudden death at any time, but I did not wish to annoy him. That is a rule of all physicians. It is not proper to tell a man with a heart trouble, but we tell his family if we can; and that is all there is of it. I felt I had my duty to do towards the company, and I felt I had done it towards Mr. Wagner. I says, 'It is very wrong of you to let your policy go in that condition, because you cannot get insurance from any other company.' 'Oh,' he said, 'I will be all right in a few days.' I says, 'You are very foolish to throw up this policy, to let your policy go, because, while you may live just as long as any other man, you cannot get insurance in your present condition.' Shall I go on and state what I said further? Q. Yes; you might as well go on and tell all. A. Then I said, 'You are making a big mistake to accept this cash surrender.' He started talking confidentially to me, and he says, 'Doctor, one dollar is worth to me more now than five dollars will be in three or four years.'"

Counsel for the defendant moved for a direction to the jury to return a verdict for defendant, contending, among other things, that the surrender

was valid in law, and could only be impeached in a court of equity, and that, even if its validity could be investigated here, the evidence was insufficient to avoid the surrender.

F. A. Baker and H. E. Spalding, for plaintiff in error.

Edwin F. Conely, for defendant in error.

Before TAFT and LURTON, Circuit Judges, and CLARK, District Judge.

TAFT, Circuit Judge (after stating the facts as above). The first question for our consideration is whether the surrender of the policy, admitted to have been signed by Wagner and Mrs. Wagner, could be impeached for fraud in a court of law. The issues as to the validity of the release were two: First, that it was obtained from the plaintiff by fraudulent representation, made on behalf of the defendant company, as to Wagner's physical condition; and, second, that Mrs. Wagner was misled as to the character of the instrument, so that she never, in fact, assented to the surrender. The two grounds are quite different. The latter goes to the execution and delivery of the instrument with a contracting mind, and is analogous to the plea of non est factum at common law. The former goes to the inducement to an act, the conscious doing of which it assumes. It is not disputed, and could not be, that, under the most stringent common-law rules of pleading, a replication of the latter kind to a plea of release was permissible. But it is contended that, where the conscious execution of a release is admitted, it can be avoided for fraud in inducing the act only in equity, and, therefore, that the court was right in holding that there was nothing in the evidence as to the false statements made concerning Wagner's physical condition which the jury could consider.

The question presented is not free from difficulty. The law side of a court of the United States is a court of common law with no equity jurisdiction, except such as the common-law courts of England exercised before the acts of parliament, which, in terms, gave them certain equitable powers. A close study of the two concurrent systems of law and equity between Lord Mansfield's time and the passage of the act of 1854 (17 & 18 Vict. c. 125), which for the first time gave the courts of law power to entertain equitable pleas and replications, would doubtless show that the more enlightened and liberal course of the chancellor in disregarding forms, and looking to the substance, and in avoiding circuity of action, by settling controversies in one suit, had a direct effect upon the procedure in the common-law courts. Certain it is that early in this century, and perhaps earlier, the common-law courts began to assert what they called an equitable jurisdiction to defeat certain inequitable defenses. The manner of doing this we shall refer to later. By the judicature act of 1873, the courts of law finally obtained full equitable powers. It is not always an easy matter to determine whether the procedure approved in cases decided in this period of transition is based on common-law or equitable principles. When we consider the American authorities, we are in still greater perplexity, because in some states the distinction between law and equity pleading and practice has been abolished as far as possible;

in other states it has been modified; and in others it remains comparatively intact. This much must be said, however: that, although the distinction between law and equity procedure has always been maintained in courts of the United States, it is natural and it is proper that the relaxing of the rigid lines between the two jurisdictions in England and in most of the states of this country should render courts of the United States, sitting as courts of law to-day, less acute than in earlier days to exclude pleas and replications having an equitable flavor, which would have been of doubtful validity in a court of law presided over by Lord Holt or Sir Matthew Hale, or even by Lord Kenyon or Lord Ellenborough. Even courts of common law must partake of the spirit of progress.

At common law, a release of a right of action, whether founded on simple contract or specialty, had to be by deed, under seal, to be of any efficacy. Leake, Cont. 794; Co. Litt. 264a, 291a. Whether one sued upon his deed might not avoid it and defend against it on the ground that it was procured from him by fraud not going to its execution and delivery, may be open to question. In Taylor v. King, 6 Munf. 358, it was sought to defend against a deed in an ejectment suit on the ground that the defendant had been defrauded into making the deed by false statements in respect of the consideration. The court refused to consider the special finding of the jury showing such fraud, saying:

"Such circumstances go to show a want of consideration; and a defendant cannot avoid a solemn deed on that ground by parol in a court of law. In that court, and on such an instrument, the principle that fraud and covin vacates every contract is to be taken in subordination to another principle, namely, that a party is estopped from averring a matter of the kind against a specialty."

The same doctrine is held in Wyche v. Macklin, 2 Rand. 426, in Vrooman v. Phelps, 2 Johns. 177, and in Dorr v. Munsell, 13 Johns. 430, which were suits in debt on bonds. And yet in Chit. Pl. (11th Am. Ed., from 6th Eng.) 962, a form of plea against debt on a bond is given as proper, in which the defendant avers that the bond was obtained from him by the plaintiff by fraud, covin, and misrepresentation, sets out specifically the misrepresentations, avers that the deed was executed in confidence of such misrepresentations, and concludes with the statement that the deed is void. This form is criticised by Mr. Perkins, the American editor, and by Chief Justice Gibson, in Stubbs v. King, 14 Serg. & R. 208; but it is noteworthy that no English case is cited to show that it is erroneous, and there are some expressions of English judges which seem to justify it.

Thus, in Edwards v. Brown (1831) 1 Cromp. & J. 312, an action in debt on a bond, the defendant, under a plea of non est factum, sought to prove that the defendant had been induced by fraud to execute the bond. The court held that this could not be done, Bayley, B., saying:

"I agree with my Brother Russell that whatever shows that the bond never was the deed of the defendant may be given in evidence upon non est factum. But if the party actually executes it, and was competent to execute it, and was not deceived as to the actual contents of the bond, though he might be misled as to the legal effect, and though he might have been entitled to avoid

the bond by stating that he was so misled, it nevertheless became, by the execution, the deed of the defendant, and he is not at liberty, upon the plea of non est factum, to say it was not."

See Hirschfeld v. Railway Co., 2 Q. B. Div. 1.

But, whatever the proper rule may have been as to other forms of specialty, the history of the course of the English and American courts in defeating releases which would have been set aside in equity justifies the conclusion that there was more liberality in allowing replications to avoid them than in the case of other specialties. The inconvenience of compelling a plaintiff in an action at law, who was met by a plea of release, to resort to an expensive and vexatious proceeding in equity to set it aside for fraud, led courts of law to exercise what has already been alluded to as their equitable jurisdiction to defeat the plea. The step was first taken in suits by an assignee of a chose in action which were brought in the name of the assignor to defeat the plea of a release by the assignor collusively and fraudulently executed to the debtor after notice of the assignment. The court did not allow a replication to be filed setting out the facts which ought, in justice, to avoid the release, but, upon a rule to show cause and affidavits, refused to permit the defendant to continue his plea on the record, and set it aside. Legh v. Legh, 1 Bos. & P. 447; Payne v. Rogers, 1 Doug. 407; Innell v. Newman, 4 Barn. & Ald. 419; Manning v. Cox, 7 Moore, 617; Mountstephen v. Brooke, 1 Chit. 390; Jones v. Herbert, 7 Taunt. 421; Furnival v. Weston, 7 Moore, 756; Doe v. Franklin, 7 Taunt. 9; Phillips v. Clagett, 11 Mees. & W. 83; Rawstorne v. Gandell, 15 Mees. & W. 303. The jurisdiction was also exercised in other cases where the plaintiff was really only a nominal party, with no interest in the suit, and had given a release, and also where there were joint plaintiffs, and one had fraudulently and collusively given a release to the defendant. The most satisfactory statement of the reason and limits of the jurisdiction is found in Baron Parke's judgment in Phillips v. Clagett, supra. It was held that the proof of the fraud in the release and of the defendant's connivance in it must be clear, or the court would not assist the plaintiff.

There is good ground for believing that when the fraud was committed by the defendant in procuring the release directly from the plaintiff, and not from a third person, this matter could be set up by replication; and this, even if the fraud did not go to the execution of the release, but only consisted of misrepresentation of material facts. This might well have been so, for it involved a much less departure from the common-law procedure to allow the plaintiff to avoid his own deed of release for fraud in the very case in which it was pleaded between the only possible parties in interest than it did to defeat a release executed by a third person who was not really a party in interest at all.

In the case of Benson v. Bennett, tried before Sir James Mansfield, C. J. (49 Geo. III.), and reported in a note to Alner v. George, 1 Camp. 392, 394, the action was for money had and received by a mariner against the owner of a privateer to recover prize money. The defendant pleaded in bar a receipt signed by the plaintiff for $500, declared to be in full of all demands in respect of the prize. The plain-

tiff was permitted to show that the receipt was obtained by a fraudulent representation as to the total prize money, and it was held that the receipt was not binding. It does not appear whether the so-called "receipt" was under seal or not.

In Wild v. Williams, 6 Mees. & W. 490, a suit for work and labor, Baugh had executed a release to Williams, which Williams pleaded in bar. Wild applied to the court for an order setting aside the plea, on the ground, established by Baugh's affidavit, that Williams had obtained the release by fraud from Baugh. The court refused to make the order, Lord Abinger saying: "If this was a fraudulent release, the plaintiffs can raise that issue on the plea." Baron Parke said: "If there was fraud on Baugh himself, so that he is not bound by the release, that will be a good replication."

In Richards v. Turner (1856) 1 Fost. & F. 1, the action was for work and labor and money paid. The plea was release by the plaintiff, and the replication that the release was obtained by fraud upon the plaintiff. In holding that the evidence did not support the replication, Pollock, C. B., said:

"The only fraud that could avoid the release would be misrepresentation as to the contents of the deed or some fraudulent misrepresentation of a matter of fact to induce the plaintiff to execute it."

It is true that this last case was tried after the passage of the procedure act of 1854 (17 & 18 Vict. c. 125, § 83), in which the plaintiff was given express authority to avoid a plea on equitable grounds, provided he began his replication with the words "on equitable grounds." The replication in the case cited, however, does not appear to have been on equitable grounds.

In Hirschfeld v. Railway Co., 2 Q. B. Div. 1, a reply to a release under seal was held good in which it was averred that it had been obtained by misrepresentation of a material fact inducing its execution. The reply was not in the form required by the statute, if equitable grounds were relied on.

Chitty, in his work on Pleading (11th Am. Ed., from 6th Eng., p. 1157), gives as a proper replication to a plea of release not only non est factum, but also that the release was obtained from the plaintiff by fraud or duress. By reference, Mr. Perkins, the editor, makes his criticism upon the plea of fraud to a specialty already mentioned apply to this replication. For the reasons given and on the authorities cited, we think the criticism is not entitled to the same weight in respect to avoiding releases as other specialties. It is worthy of comment that the common-law procedure act of 1852 (15 & 16 Vict. c. 76, Schedule B, §§ 50, 51), which was merely declaratory, except as to form, of the then procedure, gives two replications to a release,— one, that it "is not the plaintiff's deed"; and the other, that it "was procured by the fraud of the defendant."

In courts of this country, the effort of the English courts of law, early in this century, to avoid circuity of action in respect to fraudulent releases, has been approved. Welch v. Mandeville, 1 Wheat. 233; Strong v. Strong, 2 Aikens, 373; Loring v. Brakett, 3 Pick. 403; Eastman v. Wright, 6 Pick. 316, 322; Webb v. Steele, 13 N. H. 230. The courts did not find it necessary, however, even in the case

of fraudulent releases by assignors and other nominal plaintiffs, to' resort to the extraordinary method of setting aside the obnoxious plea of release by interlocutory order on affidavit, but allowed the matter in avoidance of it to be set up in a replication, and the issue to be tried by a jury.

In Eastman v. Wright, 6 Pick. 316, 322, the court say:

"In England, when a nominal plaintiff, or one of several plaintiffs, releases an action in fraud of the party in interest, the courts directly interfere and set aside the release. But in this state the courts never have exercised this power. The release may be avoided if fraudulent, but the question of fraud can only be tried by jury. In the case at bar, the question was properly submitted to the jury, and we think there is no reason to complain of their verdict."

The distinction between suits at law and in equity, in Massachusetts, it may not be always safe to follow, because of the absence of any equity jurisdiction in its courts for many years. Still, in a line of cases, all decided since the supreme judicial court of that state has had equity jurisdiction, that court has approved the procedure by which a release can be avoided by a replication in which the plaintiff sets up fraud in the procurement of the release. Smith v. Inhabitants of Holyoke, 112 Mass. 517; Mullen v. Railroad Co., 127 Mass. 86; Trambly v. Ricard, 130 Mass. 259; Squires v. Amherst, 145 Mass. 192, 13 N. E. 609; O'Donnell v. Clinton, 145 Mass. 461, 14 N. E. 747; Rosenberg v. Doe, 148 Mass. 560, 20 N. E. 176; Id., 146 Mass. 191, 15 N. E. 510; Bliss v. Railroad Co., 160 Mass. 447, 36 N. E. 65; Drohan v. Railway Co., 162 Mass. 435, 38 N. E. 1116. In many of these cases, the releases in question were under seal; in others, they were not. In many of them, the evidence of fraud would have been admissible under a replication of non est factum; in others, it would not have been, notably in the last case cited, that of Drohan v. Railway Co. In none of them was the distinction between fraud in the execution and fraud in the inducement regarded as material, except where it became necessary to determine whether money paid on the release must be returned before avoiding the release, as in Smith v. Inhabitants of Holyoke and Mullen v. Railroad Co. In O'Donnell v. Clinton, the distinction was referred to, and the authorities were cited; but the court declined to decide on which side of the line the case before it fell, and sustained the attack upon the release solely on the ground of fraud. The courts of New Hampshire, where law and equity are still kept distinct, approve the same practice in respect to avoiding releases at law as that which obtains in Massachusetts. Hoitt v. Holcomb, 23 N. H. 555. The same is true in Michigan (Stone v. Railway Co., 66 Mich. 76, 33 N. W. 24; Averill v. Wood, 78 Mich. 342, 44 N. W. 381); and in Illinois (Railroad Co. v. Welch, 52 Ill. 183; Railroad Co. v. Lewis, 109 Ill. 120). The supreme court of the United States, in Railway Co. v. Harris, 158 U. S. 326, 15 Sup. Ct. 843, approves the practice, and cites many of the foregoing cases, though it is to be said that probably, on the evidence brought out in that case, a replication of non est factum might have been supported. In the code states, there are also many cases of like character, which are not without weight on the question before us, because, even under a code, the necessity for resorting to affirmative equitable remedy in cases

where a merely negative defense will not suffice, still exists. Fuller v. Insurance Co., 36 Wis. 599; Lusted v. Railway Co., 71 Wis. 391, 36 N. W. 857; Peterson v. Railway Co., 38 Minn. 511, 39 N. W. 485; Mateer v. Railway Co., 105 Mo. 320, 16 S. W. 839; Railroad Co. v. Doyle, 18 Kan. 58. In Fuller v. Insurance Co., it will be seen that the supreme court of Wisconsin considers the question as a matter of common-law pleading, and finds no aid in the Code of the state.

Except for the peculiar sanctity anciently attaching to a sealed writing at common law, which is now disappearing, it is difficult to see how there could be any doubt about the right in an action at law to avoid a release by a reply of fraud. The release or surrender is a contract (and in the case at bar not under seal), in which, for a valuable consideration, the releasor agrees to give up all claim and interest in his right of action. In the case of a contract of sale of personal property, a party may, by tendering back either the money or the property, as the case may be, rescind the sale for fraudulent misrepresentation as to any material fact inducing him to enter into the contract, and, if sued on the contract, may plead such rescission and justify it. Why may not one on the same ground and in the same way rescind a release, or, when it is produced against him as a bar to an action, avoid it by showing the fraud? In this case the Wagners tendered the money received to the company, and thereafter declined to acknowledge its validity. This is an ordinary remedy as to all other contracts. Leake, Cont. 320, 321. Why not as to this? On page 802, Mr. Leake says:

"In the case of a releasing creditor having been induced to give the release by the fraud of the debtor, he may avoid it at his election without the aid of the court, and he may meet a plea of release in an action by replying that the release was obtained by fraud."

Our conclusion is, therefore, that it is proper in a suit at law for the plaintiff to meet a plea of release by a replication that the release was obtained by fraud, whether the fraud is in the execution, or in misrepresentation as to material facts inducing execution. We are glad to come to this conclusion, because it avoids circuity of action, and thus facilitates the administration of justice. Of course, cases may be conceived where the avoiding of a release may concern the rights of others not parties, or may involve the application of peculiarly equitable doctrines of confidential relations and the like, and thus present issues which only a chancellor, with his flexible procedure and careful discrimination, can properly adjust and decide. In such cases the parties can be remitted to equity. But, where the issue is simply one of fraudulent misrepresentation, it may be as well tried to a jury as to a court of equity, for fraud is an issue of which courts of law and equity, from time immemorial, have had concurrent jurisdiction. We find no reason, therefore, to modify the remark made by this court, speaking through Judge Lurton in Lumley v. Railroad Co., 43 U. S. App. 476, 489, 22 C. C. A. 67, and 76 Fed. 73, where he said:

"If the release had in fact been procured by fraud, he [the plaintiff] could have shown this at law, if the fact that the release was under seal had been out of the way."

The remark was perhaps not necessary to the case then before the court, but in this case, where the question calls for decision, we have no difficulty in confirming it.

We come next to the question whether there was any evidence to impeach the surrender. The charges of fraud are two: First, that the physician, Dr. Miner, speaking for the company, told Wagner that the condition of his heart was not dangerous, and that he might live for years, when he knew that his heart was in very bad condition, and that death was probable at any time, and that this false statement induced Wagner to insist upon the surrender; and, second, that Mrs. Wagner signed the surrender without knowing its contents, and induced by a misstatement of her husband to believe that it was not a surrender, but a mere arrangement by which he was to receive certain cash due on the policy. Mrs. Wagner was the beneficiary in the policy, and she alone had power to surrender the policy. Bank v. Hume, 128 U. S. 195, 9 Sup. Ct. 41. Statements made to her husband could only be made the basis of a charge of fraud on her behalf on the theory that he was her agent in the matter, as he undoubtedly was. It may be conceded that the physician did knowingly misstate to Wagner the seriousness of the condition of his heart. In order that knowingly untrue statements shall justify an action or defense of fraud in law or equity against the maker of them, it must appear— First, that he made them intending that the person complaining should act upon them; and, second, that the false statements were a substantial inducement to such action and the resulting damage.

In Clerk & L. Torts (2d Ed.) 465, the learned authors say that:

"In order to give a cause of action for deceit, not only must the statement complained of be untrue to the defendant's knowledge, but it must be made with intent to deceive the plaintiff,—with intent, that is to say, that it shall be acted upon by him."

This principle has frequent application where a statement is made by one person to another, and is acted upon by a third. In such cases the third person must show that the maker of the statement intended such third person to act on it. Barry v. Croskey, 2 Johns. & H. 23; Peek v. Gurney, L. R. 6 H. L. 377. Where the person acting on the statement is the person to whom it is addressed, and the statement taken by itself is reasonably calculated to induce such action, of course the presumption is that the result was intended by the maker. But this presumption can certainly be rebutted by other circumstances showing that the statements were made with the best motives, and for an entirely different purpose, and that such action as that taken was not intended, but, on the contrary, was, in the presence of the deceived party, in good faith deprecated. It is true that there are many cases in which the principle is broadly stated that the motive of one in deceiving another to the latter's damage is not material, but they are all cases in which the deceiver intended the deceived person to take the action he did take, and sought to escape liability for it on the ground that he intended no injury to the deceived person or benefit to himself from such induced action. Foster v. Charles, 7 Bing. 105; Corbett v. Brown, 8 Bing. 33; Polhill v. Walter, 3 Barn. & Adol. 114; Derry v. Peek, 14 App. Cas. 337, 365.

In the case before us, Dr. Miner neither on his own part, nor on that of the company, was under any legal obligation to advise Wagner of the defective action of his heart. The company was making the examination to determine whether it could give Wagner further insurance. It would have discharged its full duty if it had simply rejected his application. The doctor did not take this view, however, but actuated by the highest motives, and for the purpose of preventing Wagner from surrendering his policy, he told him that his heart action was defective, and that he could never get any more insurance, and sought to avoid the injurious effect upon Wagner's heart of such information by false assurances that there was no danger to life involved. Such a course was dictated by the most humane feeling, and justified by the most stringent rules of professional ethics. The event showed that too much was told to Wagner, as it was, for his death can be directly traced to the excitement due to the information he received from the examination. Under these circumstances, it is clear that, in making his untrue statement, Dr. Miner had no intention that Wagner should act upon it by surrendering his policy. Wagner knew that he had no such intention, because the doctor, by everything he said and did, emphatically manifested just the contrary intention. It is a case where the maxim, "Volenti fit non injuria," applies.

Again, the untrue statements did not cause the surrender of the policy. "To entitle a plaintiff to sue for a misrepresentation made to him, it is not enough to show that it was followed by damage to him; he must show that the one was the cause of the other; he must establish that, in doing the act whereby he suffered damage, he was 'adhibens fidem,' relying upon the representation being true." Clerk & L. Torts (2d Ed.) 470. In Attwood v. Small, 6 Clark & F. 232, 444, which was a bill to rescind a contract for fraud, Lord Brougham, delivering judgment, in the house of lords, gave as the third and last essential element in the complainant's case "that it should be this false representation which gave rise to the contracting of the other party." Tatton v. Wade, 18 C. B. 371; Edgington v. Fitzmaurice, 29 Ch. Div. 483; Peek v. Derry, 37 Ch. Div. 541; Smith v. Chadwick, 20 Ch. Div. 27, 44. Wagner would undoubtedly have surrendered the policy, had the doctor said nothing to him. The doctor said something of his bad condition to dissuade him from the surrender, and, for his own good, misstated its extreme danger. It may be assumed that, if Wagner had known his extreme danger, he would not have surrendered the policy. Does it follow that the doctor caused him to surrender the policy by his misstatement of it? We think not.

In Brady v. Evans, 47 U. S. App. 416, 24 C. C. A. 236, and 78 Fed. 558, this court had to consider a closely analogous case. In that case, which was an action for deceit by the depositor in a bank against the directors for false statements as to its condition, we said:

"There can be no recovery unless it can be shown that injury was done and loss occasioned by the false statement relied upon. 'In actions of this sort it was long ago laid down that fraud without damage, or damage without fraud, would not give rise to such an action.' Derry v. Peek, 14 App. Cas. 337, 343. It must therefore clearly appear upon the face of the petition that the false statement complained of actually caused loss to the plaintiff."

In this case it appears that, at the time the statement complained of was made, the plaintiff was a depositor in the defendants' bank, and the averment is that he was induced to remain a depositor by these statements. He does not aver that, but for these statements, he would have withdrawn his deposit before the failure of the bank. The date of the statement precludes the possibility that he was induced to make the deposits in the bank, because the deposits were all made before the statement. The fact is, therefore, that he lost nothing by reason of the false statements, unless he would have done something but for the false statements; otherwise, he was not induced to alter his position by the statements, and no loss was occasioned to him thereby. * * * The words of the petition really charge no more than that the plaintiff, being a depositor in the defendants' bank, acquired confidence in its safety from the statements made, whereas, if he had known the truth, he would not have remained a depositor. It is not enough in deceit to show that, if the plaintiff had known the truth, he would have done otherwise than he did. It must appear that he did otherwise than he would have done if the false statement had not been made to him."

In the case at bar, it is apparent that Wagner would have insisted on surrender if the physician had said nothing, and that what the physician said, he said only to prevent surrender, and that, though he misrepresented Wagner's physical condition, Wagner's action would have been the same if he had omitted his misstatements. Therefore they did not cause the surrender, and cannot be made the ground for setting it aside.

The second objection to the surrender is that Mrs. Wagner signed the surrender without knowing that it was a surrender. She says that, from her conversation with her husband before entering the agent's office, she understood that he did not intend to give up his insurance, but that he was merely about to receive "the interest and accrued money" due on the policy, and that upon this supposition she signed the paper handed her by the company's agent without looking at it. There is not the slightest evidence to show that the agent of the insurance company misled her in any way as to the character of the paper she was signing. Indeed, from the trend of the conversation between herself, her husband, the agent, and the physician, as detailed by her, it is difficult to believe that she did not have a clear idea of what she was doing. Giving full credit, however, as we must, in this inquiry, to her statement that she signed the surrender without knowing its contents, we are clearly of opinion that this does not invalidate the surrender, or destroy its effect as a complete bar to action on the policy. The rule to be gathered from the authorities is that neither law nor equity will give any relief to one who, being able to read, signs a paper without reading it, unless it is made to appear that his failure to read is due to the fraud or imposition of the other party.

In Greenfield's Estate, 14 Pa. St. 496, Chief Justice Gibson said:

"If a party who can read will not read a deed put before him for execution, or, if being unable to read, will not demand to have it read or explained to him, he is guilty of supine negligence, which, I take it, is not the subject of protection, either in law or equity."

In Upton v. Tribilcock, 91 U. S. 45, 50, the supreme court of the United States said:

"It will not do for a man to enter into a contract, and, when called upon to respond to its obligations, to say that he did not read it when he signed

it, or did not know what it contained. If this were permitted, contracts would not be worth the paper on which they are written. But such is not the law. A contractor must stand by the words of his contract; and, if he will not read what he signs, he alone is responsible for his omission."

The same principle is declared in many other cases. Sanger v. Dun, 47 Wis. 615–620, 3 N. W. 388; Rogers v. Place, 29 Ind. 577; Insurance Co. v. McWhorter, 78 Ind. 136; Robinson v. Glass, 94 Ind. 211; Goetter v. Pickett, 61 Ala. 387; Bishop v. Allen, 55 Vt. 423; Railroad Co. v. Shay, 82 Pa. St. 198; Hazard v. Griswold, 21 Fed. 178.

The fact that Mrs. Wagner may have been lulled into the belief that the paper was not a surrender by a previous conversation with her husband does not at all prevent the operation of the rule. The company was not responsible for her husband's statements made to her before they entered the agent's office, and out of his hearing. The agent had every reason to believe that Wagner had fully explained the transaction to his wife. In Roach v. Karr, 18 Kan. 529, a woman sought to prevent the foreclosure of a mortgage signed and executed by her, on the ground that she could read but little, and that, when she executed it, she asked her husband what it was, and he told her that it did not amount to a row of pins. It was held that, in the absence of any fraud or imposition on the part of the mortgagee, she could not be heard to say, in view of her negligence in not having the paper read to her, that the mortgage was not her mortgage. See, also, Meka v. Brown, 84 Iowa, 711, 45 N. W. 1041, and 50 N. W. 46. The law and the evidence did not justify the submission of this issue to the jury.

Finally, it is contended that it was the duty of the agent and the physician to tell Mrs. Wagner of the dangerous condition of her husband's heart before she signed the surrender. Before Mrs. Wagner left the office, and while the transaction was in progress, Mrs. Wagner was told that Wagner's heart action was defective, and that, in consequence, he could get no further insurance in any other company. We do not regard it as important whether this was before Mrs. Wagner signed the surrender, or just after. It was certainly at a time before the transaction was completed by receipt of the check, and when, had Mrs. Wagner chosen to withdraw from the surrender, she could have done so. It is not claimed that the physician misrepresented to her the condition of Wagner's heart.

Our conclusion upon the part of the case already considered makes it unnecessary to discuss the other grounds upon which it is sought to sustain the correctness of the trial court's ruling, and leads us to affirm the judgment of the circuit court, with costs.