[Civ. No. 9912. First Appellate District, Division Two.—July 14, 1936.]

FRED LAUDAN, Respondent, v. THE MUTUAL LIFE INSURANCE COMPANY OF NEW YORK (a Corporation) et al., Appellants.

Frederick L. Allen, F. Eldred Boland and Knight, Boland & Riordan for Appellants.

M. Mitchell Bourquin and Laurenz J. Krueger for Respondent.

SPENCE, J.—Plaintiff brought this action seeking to recover damages for the cancellation of a policy of life insurance, the cancellation and the surrender of which policy was alleged to have been procured by fraud on the part of defendants. Upon a trial by jury, plaintiff had judgment and from said judgment defendants appeal.

In presenting this appeal, appellants have listed several headings in their brief, practically all of which present, in one form or another, the claim that the evidence was insufficient to show actionable fraud on the part of appellants. In arguing these points, appellants have failed to state the evidence most favorable to respondent. There were numerous conflicts in the evidence, but on this appeal we are bound to disregard these conflicts and determine whether there was any substantial evidence to sustain the judgment. We

will therefore proceed to state the evidence offered by respondent.

In 1927 respondent took out a policy of life insurance with appellant Mutual Life Insurance Company of New York. Under said policy, the company agreed, in case of death, to pay $10,000 and, in case of total disability, to pay the sum of $100 per month and waive all premiums during the period of total disability. The annual premium of $320.90 was paid each year and, a week or ten days prior to September 13, 1933, respondent paid the premium due on that date for the ensuing year. He then expressed a desire to make a change in his policy and he was directed to appellant Conklin, who was the representative of the company. He told Mr. Conklin that he wanted to change to a twenty-year endowment policy, retaining the disability protection which he had under the existing policy. Mr. Conklin agreed to have the policy prepared and to notify respondent. No mention was made of retirement income insurance on this occasion. Mr. Conklin phoned respondent on September 15, 1933, and told him that the policy was ready. Respondent went to the office of the company on that day and Mr. Conklin told him that he had the policy worked up, but before going further it would be necessary to have respondent examined by a doctor. Respondent went to appellant Dr. Allen, a salaried employee of the company who kept regular office hours in the company offices. Mr. Conklin told Dr. Allen that respondent wanted to ''change his policy''. The examination lasted for about 45 minutes and admittedly revealed that respondent was not in good health. Respondent's blood pressure was high and his urine contained both albumen and sugar. This examination was treated by Dr. Allen and by the company conclusively as determining that respondent was then uninsurable. The testimony nevertheless shows that Dr. Allen merely told respondent that his blood pressure was a little high but that said condition did not amount to anything as it was probably caused by coming up in the high building. Otherwise he told respondent ''You are in good health. . . . You are as sound as a dollar.'' He directed respondent to see Mr. Conklin again. After respondent returned to Mr. Conklin's office, Mr. Conklin excused himself and was gone for ten or fifteen minutes. Mr. Conklin returned and said that Dr. Allen had stated that respondent

was "sound as a dollar" but had a little high blood pressure which did not amount to anything. Thereafter Mr. Conklin first suggested the retirement income policy to respondent and considerable discussion followed. Mr. Conklin stated that an endowment policy would be too expensive, that it was not the right kind of policy for respondent and that he should have the "modern-up-to-date" income policy which most business people had taken out. Respondent insisted that he wanted the disability feature in his policy and a change to an endowment policy even if the principal sum of the policy would have to be reduced in order to permit the annual premium to remain approximately the same. Mr. Conklin argued, "that would cut the principal sum too low. . . . I don't think it is the right kind of policy for you." He told respondent that he should not worry about a disability clause as the doctor had found him in good health except for a little high blood pressure which did not amount to anything. He told respondent that he might not be able to get the disability and premium waiver protection then because of his blood pressure but that it could be reinstated later on. At the end of the discussion, Mr. Conklin prepared application blanks for two retirement income policies and respondent signed the same. Mr. Conklin also prepared the following letter and obtained respondent's signature thereto: "The present policy I have with your Company is no longer the form I desire and does not fit my requirements. I wish to surrender this policy and transfer the funds thereon to one of your new Retirement Income Endowments. This request is of my own volition and of my own instigation. I have no requirement for an ordinary life policy but now desire to have a policy that will accumulate funds for my own future."

The transaction was subsequently consummated by the surrender and cancellation of the existing life insurance policy and the issuance to respondent of two retirement income policies. One of these policies provided for the payment to respondent of $6.82 per month beginning in 1948. The other provided for the payment to respondent, who was then 40 years of age, of the sum of $30 per month for 10 years beginning at the age of 55. Neither policy was a life insurance policy and neither contained any disability or premium waiver features.

In February, 1934, and shortly after the consummation of said transaction, respondent consulted another physician. The examination disclosed that respondent's condition was very bad, that he had diabetes in an aggravated form, that the quantity of sugar in his urine ran very high and that he had cirrhosis of the liver. He was immediately sent to a hospital and has been under treatment and upon a strict diet ever since that time. He has been totally disabled ever since and it appears to be conceded that said disability is both total and permanent. The uncontradicted testimony shows that he had an expectancy of only about three years at the time of the trial. The testimony further showed that his ailments were such that they were readily ascertainable at the time of examination by Dr. Allen on September 15, 1933, and it affirmatively appears that said examination did reveal the diabetic condition.

The foregoing evidence and the inferences to be reasonably drawn therefrom were ample to sustain the jury's implied findings on every fact necessary to constitute actionable fraud. (12 Cal. Jur. 724.) The evidence was sufficient to show that appellants affirmatively represented to respondent that he was in good health and as "sound as a dollar" except for a little high blood pressure which was of no particular significance; that the truth was that he was in very poor health, suffering from diabetes and on the verge of a complete collapse; that appellants knew the falsity of said representations and made them with the intention that respondent should act thereon; that the falsity of said representations was unknown to respondent; that respondent did rely upon said representations and did act thereon to his damage. It is needless to state that the representations were as to a material fact in the transaction mentioned.

In their brief, appellants ignore the alleged representations as to soundness of health and claim that there was no duty upon the part of appellants to reveal the facts. In view of the evidence showing that appellants made affirmative representations which were false, the question of whether they were under any duty to reveal the facts is immaterial. (*Pohl* v. *Mills*, 218 Cal. 641, 654 [24 Pac. (2d) 476].) Appellants further rely upon the case of *Wagner* v. *National Life Ins. Co.*, 90 Fed. 395. The facts there are to some degree similar to those before us but there are many

distinguishing points. The main point of distinction, however, is that the appeal there was from a judgment in favor of the defendant. There the policyholder had a serious heart condition which was disclosed upon the examination. The doctor there told the policyholder of his condition but in order not to excite the fears of the policyholder, he stated that the condition was not serious. On page 406, after discussing the fact that the company was under no duty to reveal the exact situation, the court said: "It would have discharged its full duty if it had simply rejected his application. The doctor did not take this view, however, but *actuated by the highest motives, and for the purpose of preventing Wagner from surrendering his policy, he told him that his heart action was defective, and that he could never get any more insurance,* and sought to avoid the injurious effect upon Wagner's heart of such information by false assurances that there was no danger to life involved. Such a course was dictated by the most humane feeling, and justified by the most stringent rules of professional ethics. . . . Under these circumstances, *it is clear that, in making his untrue statement, Dr. Miner had no intention that Wagner should act upon it by surrendering his policy. Wagner knew that he had no such intention, because the doctor, by everything he said and did, emphatically manifested just the contrary intention.*" (Italics ours.) The court further found in that case that the evidence justified the finding that Wagner would have surrendered his policy even though the doctor had said nothing to him. In the present case, the appeal is from a judgment in favor of plaintiff and under the circumstances revealed by the evidence above set forth, the jury was justified in reaching the opposite conclusions from those reached in the cited case.

 The last heading of appellants' brief reads, "It is of course, well settled that in an action of damages for deceit plaintiff must allege and prove the precise amount thereof." This may be conceded as a general rule, but here appellants' attack seems to be directed at the complaint rather than at the evidence relating to damages or the instructions on that subject. Disregarding for the moment the fact that respondent received two retirement income policies upon the surrender of his life insurance policy, the evidence did show the amount of damage sustained by the wrongful cancella-

tion of the policy at a time when the assured was no longer insurable and the instructions were properly drawn under the rules indicated in *Mutual Reserve Fund Life Assn.* v. *Ferrenbach,* 144 Fed. 342 [7 L. R. A. (N. S.) 1163], *American Insurance Union* v. *Woodard,* 118 Okl. 248 [247 Pac. 398, 48 A. L. R. 102], and *Ebert* v. *Mutual Reserve Fund Life Assn.,* 81 Minn. 116 [83 N. W. 506, 84 N. W. 457]. (See, also, 48 A. L. R. 116.) From the evidence it appeared that the retirement income policies were practically valueless to respondent in his condition at the time the transaction was consummated. Prior to the trial, these policies were surrendered to the company and on the trial respondent disclaimed any interest therein. It would therefore seem that the failure of respondent to allege the value thereof in his complaint and the failure of the court to instruct the jury with respect to making an allowance therefor in fixing the amount of the damage sustained was not prejudicial to appellants. We therefore believe that even if there was error in this regard, the judgment should nevertheless be affirmed. (Const., art. VI, sec. 4½.)

The judgment is affirmed.

Nourse, P. J., and Sturtevant, J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on August 13, 1936.