## UNION PAC. R. CO. v. WHITNEY.

### (Circuit Court of Appeals, Eighth Circuit. August 17, 1912.)

### No. 3,590.

1. APPEAL AND ERROR (§ 184*)—AVOIDANCE—MODE OF TRIAL—WAIVER.

Where plaintiff, in an action at law, replied that a release set up by defendant as a defense was invalid because of plaintiff's incapacity to execute it at the time it was executed, and the reply was not assailed in any manner, or objection made in the circuit court to the mode of trial, defendant waived the right to claim that, as the release was at most only voidable, it was binding on plaintiff until he was relieved therefrom by a court of equity.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1149, 1150, 1179–1183; Dec. Dig. § .184.*]

2. APPEAL AND ERROR (§ 183*)—REVIEW—QUESTIONS NOT RAISED AT TRIAL.

Where the trial court had jurisdiction of the subject-matter of the action, an objection to the form of the action or theory of the cause, not urged at the trial, would not be reviewed on appeal.

[Ed. Note.—For other cases, see Appeal and Error, Cent. Dig. §§ 1161–1165; Dec. Dig. § 183.*]

3. RELEASE (§ 24*)—INVALIDITY—VACATION—LAW OR EQUITY.

Where, in reply to a defense setting up a release in bar, plaintiff alleged that at the time the release was executed he was mentally incapable of making it, such objection raised the issue of its legal existence, and was therefore available in the action at law without first proceeding to have the release set aside in equity.

[Ed. Note.—For other cases, see Release, Cent. Dig. §§ 41–46; Dec. Dig. § 24.*]

4. RELEASE (§ 59*)—VACATION—MENTAL INCAPACITY—INSTRUCTIONS.

Where plaintiff pleaded mental incapacity in avoidance of a release pleaded in bar; an instruction that the release was of the highest significance, and if it was entered into with an understanding of the rights of the parties either party was at liberty to deny its force and effect, or to say he did not understand it, but, "when it appears that either party was in a situation as to his physical condition, or as to his state of mind, which makes it probable that he acted without an understanding of the act with which he is charged, the instrument itself may be disregarded," was proper.

[Ed. Note.—For other cases, see Release, Cent. Dig. § 115; Dec. Dig. § 59.*]

5. DAMAGES (§ 173*)—DAMAGE—MATERIALITY—POST OFFICE REGULATIONS.

In an action for permanent injuries to a postal clerk, he testified that he received $800 a year from the government and, in addition, about $75 a month as a musician and carpenter, when not on duty; that he made a trip every three days, and was off duty for three days—his time being so arranged as to enable him to play in an orchestra in the evening, whether he was on duty or not. Held, that a section of the post office regulations, providing that the compensation of postal clerks is for daily service, whether on or off duty, that their entire time is subject to the control of the Post Office Department, and that lay-off periods were granted for rest and study, and should not be utilized for engaging in other business, and evidence that the usual requirements would prevent any railway mail clerk from engaging in other occupations, was properly excluded as immaterial.

[Ed. Note.—For other cases, see Damages, Cent. Dig. §§ 490–492, 501; Dec. Dig. § 173.*]

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

**6. CARRIERS (§ 321*) — INJURY TO PASSENGERS — POSTAL CLERKS — CARE REQUIRED.**

Plaintiff, a postal clerk, was injured while on his run by the falling of a beam or support for cots, placed in the car by defendant railroad company for the use of the clerks, the fall of which was alleged to have been caused by defendant's failure to furnish and maintain suitable supports for the cots. The car on which plaintiff was employed ran through from Council Bluffs to Ogden; plaintiff's run beginning at Cheyenne, where the car arrived about 1 o'clock a. m., having started from Council Bluffs about 7 o'clock the previous morning. *Held*, that it was defendant's continuous duty to furnish and keep the car in a reasonably safe condition for the use of the postal clerks while they were employed therein, without reference to whether it was rendered defective by postal clerks employed on the run before the car arrived at the place where plaintiff was to take up his work therein, or by employés of defendant, or others not in defendant's employ; and hence an instruction, that if the car was rendered unsafe by the negligence of some one other than a railroad employé, "after the car started on its run," defendant would not be liable, did not impose on defendant as great a duty as it was bound to bear, and was therefore not error.

[Ed. Note.—For other cases, see Carriers, Cent. Dig. §§ 1247, 1326–1336, 1343; Dec. Dig. § 321.*

Liabilities to employés of others carried under contract with carrier, see note to Clough v. Grand Trunk Western Ry. Co., 85 C. C. A. 5.]

**7. RELEASE (§ 58*) — RATIFICATION — REPUDIATION — TIME.**

Plaintiff was injured by defendant's alleged negligence May 3, 1907, and on the next day, while suffering from his injuries and under the influence of drugs, was induced to settle with defendant for $66 and executed a release. On November 4, 1909, before commencing suit, plaintiff offered to return the money, with interest, which offer was refused, and the tender kept good by depositing the amount with the clerk for defendant's use. *Held*, that plaintiff's delay in rescinding the release was not so great as to bar his right as a matter of law; but the question whether the offer to return was seasonably made was for the jury.

[Ed. Note.—For other cases, see Release, Cent. Dig. §§ 109–114; Dec. Dig. § 58.*]

Smith, Circuit Judge, dissenting in part.

In Error to the Circuit Court of the United States for the District of Wyoming.

Action by George W. Whitney against the Union Pacific Railroad Company. Judgment for plaintiff, and defendant brings error. Affirmed.

John W. Lacey (Herbert V. Lacey, on the brief), for plaintiff in error.

H. V. S. Groesbeck (Cassius M. Eby, on the brief), for defendant in error.

Before ADAMS and SMITH, Circuit Judges, and REED, District Judge.

REED, District Judge. George W. Whitney, the defendant in error, who will be called the plaintiff, recovered judgment in the Circuit Court against the Union Pacific Railroad Company, which will be called the defendant, for personal injuries to himself, alleged to

have been caused by the negligence of the Railroad Company, to reverse which the defendant prosecutes this writ of error.

The plaintiff was employed as a United States postal or mail clerk in a mail car in use upon defendant's road in Wyoming for carrying the United States mails, and was, on May 3, 1907, injured by the falling of a beam or support for beds or cots placed in the car by the defendant for the use of the postal clerks employed therein, which beam struck the plaintiff on the back of the head while he was engaged in the performance of his duties in the car, causing the injuries of which he complains. The negligence of the defendant, which is alleged to have caused the injury to the plaintiff, is in failing to exercise reasonable care to furnish suitable supports and appliances for maintaining the beds or cots in their position in the car when not in use by the postal clerks, and a reasonably safe place in which the plaintiff might work in the performance of the duties required of him as such postal clerk.

The defendant by answer admits that the plaintiff was employed as a postal clerk in a mail car upon one of its trains, and that he was injured by the falling of a beam or support for beds or cots placed by it in said car for the use of the plaintiff and his associate clerks as alleged, but denies all negligence upon its part in the construction of the car, the placing of the cots or beds therein, and the appliances for maintaining them in proper position, and avers that the falling of the bed or cot, and the injury to the plaintiff by reason thereof, was because of his own neglect and that of his associate clerks, and that it had no control over the taking down and replacing of the cots by them.

As a further and fourth defense, it alleged that on May 4, 1907, the day after the alleged injury to the plaintiff, it paid to him, and the plaintiff accepted from it, $66 in full satisfaction and discharge of the causes of action alleged in plaintiff's petition; and as a fifth defense it alleged that on said May 4th, in consideration of said sum of $66, the plaintiff executed and delivered to the defendant a release in writing, releasing it from all claims or causes of action whatsoever growing out of, or that might thereafter arise because of, the accident and injury to the plaintiff alleged in the petition. To this answer the plaintiff replied, denying the alleged negligence upon his part and reaffirming the allegations of his petition.

As to the alleged payment of $66 in satisfaction and release of the injuries complained of by him, he says:

"That he admits, upon information and belief only, that the release set forth in said answer was signed by him at the time stated therein; but he avers, in connection with the allegations of said defense, that at the time stated he was, as set forth in his petition, unconscious and ill and in a state of torpor, suffering great pain and misery, and was not in his right mind, and that his mental faculties were so impaired by reason of the injuries he had received and the administration of drugs and medicines to him that he was not rational, and did not and could not rationally form any intention with relation to the acts charged in said defenses, and that said release was not and is not, therefore, his act or deed, and was and is null and void by reason of the fraud inhering in the execution of the release under the facts herein stated."

He further says that on November 4, 1909, he tendered back to the defendant the said sum of $66, with interest, which was refused by the defendant, and he now and here tenders back to the defendant the said sum of $66, with interest, and deposits said sum with the clerk of the court for the use of defendant.

What the arrangement was between the government and the defendant for equipping and furnishing the mail car for the carriage of the mails and the postal clerks while performing their duties therein does not appear. The case was tried, however, upon the theory that it was the duty of the defendant to equip and furnish a car with suitable supports and appliances for maintaining the cots in their proper position therein; also that plaintiff was a passenger upon the train at the time of his injury, and entitled to the rights of a passenger against the defendant as a common carrier of passengers. Whether or not the plaintiff, at the time he was injured, stood in the relation of a passenger to the defendant, and was entitled to the rights of a passenger as against it, we need not determine. See Chicago & N. W. Ry. Co. v. O'Brien, 132 Fed. 593, 67 C. C. A. 421, and note.

In argument counsel for defendant have grouped the assignments of error into four classes, viz., (1) those in which it is claimed that the court adopted an incorrect rule as to the measure of damages; (2) those in which it adopted an incorrect rule as to the liability of the defendant; (3) those in which the court permitted the plaintiff to call in question, in an action at law, the release which he had given to the defendant for the injuries of which he complains; (4) that in which the court refused to hold that the retention by the plaintiff of the fruits of the settlement constituted an irrevocable ratification of the settlement and release.

[1] The principal contention of the defendant is that it was error to permit the plaintiff to avoid in this action the release pleaded by it, because of his alleged mental incapacity to make the same; that the release was not void, but at most only voidable, and until set aside was valid and binding upon the plaintiff, and only a court of equity could relieve him from its effect. The reply, setting forth the facts upon which the plaintiff relied to avoid the release, was not assailed by the defendant in any manner, nor was objection made in the Circuit Court to the mode of trial. The defendant must therefore be held to have waived this question of procedure. Union Pacific Ry. Co. v. Harris, 63 Fed. 800, 12 C. C. A. 598.

[2] In that case a like question was urged for the reversal of the judgment, of which this court said:

"The defendant did not demur to the plaintiff's replication upon the ground that a court of law could not try the issues it presented. These issues were tried to the jury without objection; and it is now too late to object for the first time in the appellate court to that mode of trial. The objection that an action should have been brought at law, instead of in equity, or vice versa, is waived by a failure to interpose it at the proper time in the court of original jurisdiction. * * * If a party, when sued at law, conceives that the action, or any material issue in it, is of equitable cognizance, he must interpose the objection at the threshold of the case, and will not be heard to make it for the first time in the appellate court. The general prin-

ciple is now well established that an appellate court will not entertain an objection to the form of the action, when the objection was not interposed in apt time in the trial court. It will be presumed that the parties assented to the theory that the remedy adopted was the proper one; and they will be held to that theory on appeal. Moreover, it is a general rule that questions not presented to the trial court will be deemed waived."

This rule, however, must be taken with the qualification that the court has jurisdiction of the subject-matter of the controversy. Reynes v. Dumont, 130 U. S. 354–395, 9 Sup. Ct. 486, 32 L. Ed. 934; Kilbourn v. Sunderland, 130 U. S. 505–514, 9 Sup. Ct. 594, 32 L. Ed. 1005; Insley v. United States, 150 U. S. 512–515, 14 Sup. Ct. 158, 37 L. Ed. 1163. The Harris Case was affirmed by the Supreme Court in Union Pacific Ry. Co. v. Harris, 158 U. S. 326, 15 Sup. Ct. 843, 39 L. Ed. 1003, without noticing the question of the mode of trial, though it appeared upon the face of the record.

It is true that at the close of the evidence the defendant moved for a directed verdict in its favor, but stated no ground upon which it based such motion, and the attention of the court was not called to this question. To sustain its contention now urged would be ·to reverse the judgment upon a question not presented to nor decided by the Circuit Court, which this court has more than once held that it will not do. Lesser Cotton Co. v. St. Louis, I. M. & S. Ry. Co., 114 Fed. 133–140, 52 C. C. A. 95; Hatcher v. Northwestern National Insurance Co., 184 Fed. 23–25, 106 C. C. A. 225.

[3] But if the objection had been timely raised in the Circuit Court we are of opinion that it would have been unavailing; for, if plaintiff was mentally incapable of making the release at the time it was signed, this, like fraud inhering in the execution of the instrument, goes to the question of its legal existence; and this may be shown in actions at law upon the instrument, as well as in equity. Hartshorn v. Day, 19 How. 211–223, 15 L. Ed. 605; George v. Tate, 102 U. S. 564–570, 26 L. Ed. 232; Pacific Mutual Life Ins. Co. v. Webb, 157 Fed. 155, 84 C. C. A. 603, 13 Ann. Cas. 752.

The distinction between the nonexistence of a deed or other instrument in writing, which the alleged maker never executed, nor intended to execute, because of his mental incapacity to do so, or which he was induced by fraud or trickery to execute, not intending to do so, and those where he knowingly signed the instrument, but was induced to do so by the fraud or misrepresentation of material facts by the party procuring the same, is clear and well recognized. In the former case the nonexecution of the instrument may be shown in an action thereon at law, as well as in equity; in the latter the instrument can only be avoided or set aside by a direct suit in equity. But see Wagner v. National Life Ins. Co., 90 Fed. 395, 33 C. C. A. 121, where it is held, in a carefully considered opinion by the Court of Appeals for the Sixth circuit, that the instrument in either case may be avoided in an action thereon at law. That opinion, however, so far as it holds that the instrument may be avoided at law for the misrepresentation of material facts inducing its execution, was disapproved by this court in Pacific Mutual Life Ins. Co. v. Webb, above. The objection of the

defendant to the judgment upon the ground of the mode of trial must therefore be denied.

[4] The testimony of the plaintiff in regard to his mental condition at the time the release was signed was, under the pleadings, properly admitted in rebuttal, and was such as to require its submission to the jury. Upon that the court charged the jury as follows:

"The defendant pleads and offers in evidence a settlement by the execution of a receipt and release for all liability; the consideration being $66. A release of the character of the one offered in evidence is generally of the highest significance; for the rule is that when it appears that the situation and circumstances of the parties were such, when the release was executed, that it was entered into with an understanding of the rights of the parties respectively, and that the intent (was) to include all matters of difference between them, and there seems to be no reason to believe that any mistake was made in respect to it, then neither party is at liberty to deny the force and effect of what is therein contained. He is not at liberty to say that he did not understand it. *On the other hand, when it appears that either party was in a situation as to his physical condition, or as to his state of mind, which makes it probable that he acted without an understanding of the act with which he is charged, the instrument itself may be disregarded.* In this instance the testimony tends to show that the plaintiff was injured on May 3d; and on May 4th, while he was in bed, apparently ill, he was approached by the agent of the defendant company, and after some conversation signed the receipt and release which has been admitted in evidence. *It becomes a question, therefore, for you to determine from the evidence whether he was in a condition to know what he was doing. If he did, he is bound by it, and your verdict must be for the defendant. If he did not, and you say from the evidence that his faculties were in such a state that he could not comprehend what he was doing, and the force and effect of the paper which he signed, you may say he is not to be charged with it.* Upon this question the testimony is conflicting, and you must determine it from a consideration of all of the evidence given in relation thereto."

The defendant complains particularly of that portion of the charge which reads in this way:

"On the other hand, when it appears that either party was in a situation as to his health, physical condition, or as to his state of mind which makes it probable that he acted without deliberation, and without an understanding of the act with which he was charged, the instrument itself may be disregarded."

But this is copied almost verbatim from the charge in the Harris Case; and to hold that the court erred in giving it, in connection with other parts of the charge, would be to hold that the Supreme Court erred in approving the charge in the Harris Case. The charge of the court as a whole fairly submitted to the jury the question of the quantum of proof necessary to show the plaintiff's mental incapacity that would relieve him from the release pleaded by the defendant.

[5] There was testimony tending to show that plaintiff's injury was permanent; and upon the trial he testified in his own behalf, without objection, that he was receiving a salary of $800 a year from the government as a postal clerk, and, in addition, about $75 a month from other sources as a musician, and as a carpenter, when not upon duty; that he made a trip every three days, and

was off duty for three days; that he started upon his run about 1 o'clock in the morning, and was thus enabled to play in an orchestra in the evening before starting, as well as when off duty; that postal clerks receive an increase in salary July 1st of the year; that he was in line of promotion, and if he had not been laid off he would at the time of the trial, have been in a class whose salary was $1,300, a year. The defendant offered in evidence section 1472 of the Regulations of the Post Office Department, relating to railway mail clerks, as follows:

Section 1472:

"The compensation paid to railway postal clerks is for daily service, whether they are on duty or not, and therefore their entire time is subject to the control of the Post Office Department. Lay-off periods are granted for rest and study, and must not be utilized by clerks for the purpose of engaging in other business."

And it offered to prove by the chief clerk of the railway mail service in the division in which plaintiff was employed:

"That, in addition to about one hour and a half a day for study, the usual requirement of rest would prevent any railway mail clerk from engaging in other occupations, and would especially prevent playing in an orchestra until 12 o'clock at night, or anything of that kind."

Upon objection by the plaintiff, this rule and testimony were excluded by the court. The defendant saved an exception, and requested an instruction that the rule was admissible as bearing upon plaintiff's earnings as affecting the measure of his recovery, which was denied. We are of opinion that this rule and the testimony offered were wholly immaterial upon this question. The salary and other earnings the plaintiff was receiving at the time of his injury were admissible as bearing upon his earning capacity or ability to earn money; and the fact, if it was a fact, that under the terms of his employment with the government he was forbidden to engage in any other employment would not lessen his capacity or ability to earn money. The government might have insisted upon his observance of the rule of the department while he was in its service, but that was a matter between him and the government; and the existence of the rule, or its requirements, would not lessen his earning capacity or ability in other lines of employment, should he for any reason leave the government service and engage therein. The evidence that the plaintiff was in the line of promotion was not objected to by the defendant, and is not complained of. Had it been objected to, it might, perhaps, have been excluded as being too remote or speculative. Richmond & Danville R. Co. v. Elliott, 149 U. S. 266–269, 13 Sup. Ct. 837, 37 L. Ed. 728; Brown v. C., R. I. & P. Ry. Co., 64 Iowa, 652, 21 N. W. 193; Chase v. B., C. R. & N. R. Co., 76 Iowa, 675, 39 N. W. 196. The jury was not instructed that it might consider that plaintiff was in line of promotion, or the probable increase of his salary if he remained in the employ of the government, as affecting the measure of his recovery. It was not error, therefore, to exclude the rule and the proffered testimony, or to refuse the requested in-

struction. After excluding the rule, there was nothing upon which to base the requested instruction.

[6] The defendant requested the court to charge the jury that:

"In this case it is incumbent on the plaintiff to show by a preponderance of the evidence that the construction of the support for the bunks was negligently faulty in some respect; and if you find from the evidence that the support and appliance as furnished by the defendant were in all respects sufficient, and it is further left to conjecture as to who it was that left the support out of its proper place or removed the cotter pin, and that the accident occurred by reason of such leaving the bar out of its place or such removal of the cotter pin, then your verdict will be for the defendant."

Which request the court denied. As bearing upon this question, the court charged the jury that the burden was upon the plaintiff to prove by a preponderance of the evidence the negligence of the defendant as charged in the petition, and that the plaintiff was injured solely because thereof; also as follows:

"If, upon the other hand, you find from the evidence that the appliances, namely, the bar and its fastenings, were entirely sufficient for the purposes for which they were calculated to be used, and properly secured, and that the bar in this case did not fall because of any negligence on the part of any of the railway employés, * * * the defendant would not be liable.

"If you should find from the evidence that the appliance or bar was sufficient, and the manner in which it was secured to the car was sufficient, and that it was kept in that condition when in charge of the employés of the railway company, but that it was rendered unsafe by the negligence or carelessness of some one other than a railroad employé, *after the car started on its run*, it could not then be held liable. In other words, it is liable for its own negligence and the negligence of its employés only, but not for the negligence of other persons, for injury caused by an appliance that the defendant and its employés had left in a safe condition, but was rendered unsafe by the negligence of a postal clerk, or other person not in the employ of the railroad company, who had access to the car *during the time it was on the road*."

To that portion of the charge in italics, the defendant excepted, and contends that it makes the defendant liable for defects in or the unsafe condition of the appliances arising without its fault, after it had put them in a proper condition, while the car was at Council Bluffs before it started on the run, and also those arising after it had started, or while it was on the road. It appears from the testimony that the mail car started from Council Bluffs about 2 o'clock in the afternoon, and was to run through to Ogden; that mail clerks, other than plaintiff and his fellow clerks, entered the car at Council Bluffs about 7 o'clock in the morning before the car started, and commenced working therein; that the plaintiff's run began at Cheyenne, where he and his associates entered the car about 1 o'clock in the morning, and the accident to him occurred about 6 o'clock on that morning somewhere near Rawlins, Wyo.; and it is contended in behalf of the defendant, if we correctly understand its counsel, that if the appliances for the support of the bunks were rendered unsafe by postal clerks, or some one other than an employé of the defendant, while the car was in the yards at Council Bluffs, and before it started upon its run, this would relieve the defendant from liability; but under the instructions the

defendant would be relieved from liability only in the event that the defect in or unsafe condition of the appliances were caused by a postal clerk, or some one other than an employé of the defendant, after it had put them in a safe condition, and the car had started on its run. The thought of the court obviously was that it was the duty of the defendant to exercise reasonable care to see that the appliances were in proper condition when the car was placed at the disposal of the mail clerks, and that any defect in, or unsafe condition thereof, arising before that time would render the company liable for an injury resulting to a clerk because thereof; but that if the appliances became defective or unsafe by the act of a postal clerk, or some one not an employé of the defendant, after the car had started from Council Bluffs, or was on the road, that would relieve the company from liability for such defect; and this is the thought of the instruction.

The instruction as given is fully as favorable to the defendant as it had a right to demand. If it was the duty of the defendant to furnish and keep the car in a reasonably safe condition for the use of the postal clerks while they were employed therein, this was a continuing duty; and the plaintiff should not be held responsible for what the postal clerks, or employés of the defendant, or those not its employés, did while the car was in the yards at Council Bluffs, or while on the run from Council Bluffs to Cheyenne, where the plaintiff and his associates entered the car for their run. At most, he would only be responsible for his own acts, or those of his associate clerks employed with him, or others having access to the car, after he entered the same at Cheyenne. The instruction as given relieves the defendant from liability for the acts of postal clerks and others not employés of defendant, who entered the car while it was in the yards at Council Bluffs, or was on the run from Council Bluffs to Cheyenne, thus making the plaintiff responsible for the acts of postal clerks, or others not employés of the defendant, after the car left Council Bluffs, and before the plaintiff entered it at Cheyenne, as well as afterwards. This, we think, was as favorable to the defendant as it could rightly demand, and it has no valid ground of complaint to the charge as given, or to the refusal of the instruction requested by it.

[7] The defendant also requested the court to charge that:

"In this case the uncontradicted evidence shows that the plaintiff had knowledge of the settlement made between him and the defendant as early as May, 1908. He did not offer to set aside or rescind the release made by him upon the settlement until November 4, 1909. This was too late. He could not thus retain the fruits of the settlement and at the expiration of the time stated attempt to set it aside. The settlement is therefore binding upon him, and you will find for the defendant."

The question of the ratification of the settlement and release by reason of the delay of the plaintiff in offering to return to the defendant the $66 received as the consideration therefor, admitting, without deciding, that under section 4401, Compiled Statutes of Wyoming 1910, it was properly pleaded, is one of fact. Pence v. Langdon, 99 U. S. 578, 25 L. Ed. 420.

The release was procured by a claim agent of the defendant the day following the injury, when the plaintiff was in bed suffering from the injury and stupefied by drugs administered to him to relieve his pain, and when the full effect of the injury was not, and obviously could not then have been, known to either the plaintiff or the claim agent. On November 4, 1909, before the commencement of the suit, the plaintiff offered to return to the defendant the $66, with interest thereon from the time he received it, which offer was refused, and the tender has been kept good by depositing the amount with the clerk of the court for the use of the defendant. The defendant has not changed its position nor condition in any respect whatever because of the plaintiff's failure to sooner return to it the month's salary, and it is apparent that it would have refused the offer, had it been made in May, 1908, or even earlier; for it obviously intended to retain the release thus procured by its energetic claim agent to defeat the recovery of anything more for the injuries sustained by plaintiff. Whether or not the offer to return the $66 was seasonably made was a question for the jury. The court did not err, therefore, in refusing the request.

The questions of defendant's negligence, and the contributory negligence of the plaintiff, are settled by the verdict of the jury.

Some other questions are urged by the defendant against the judgment, which we have carefully considered, and it must suffice to say that they afford no ground for its reversal.

The judgment is affirmed.

SMITH, Circuit Judge (dissenting). I concur in all of the foregoing opinion, except as to the exclusion of section 1472 of the Postal Laws and Regulations.

The claimant was not a regular postal clerk. He testified:

"I began work for the government before I took the examination, some time in September or October, and I took the examination the 8th of November. Q. Of what year? A. 1906. Q. Yes. A. And I was running to Green River on what is known as the 'helper' run. Q. And what name applies to that position besides helper? A. Substitute mail clerk. Q. Is the name 'probationer' also used? A. Yes, sir."

The accident happened on May 3, 1907. The regulation 1472 forbade clerks engaging in any other business. It had no application to substitutes or other than full clerks. Claude Glenn testified:

"Q. If he had not been laid off, state whether or not he would have received promotions in the regular line? A. I think he would."

Mr. William E. Hindrichs testified:

"Q. State whether or not he was in the regular line of promotion under the rules of the Post Office Department? A. He was; yes, sir."

After the injury the claimant returned to work, and drew from November 20, 1908, until the 1st of July, 1910, at the rate of $1,000 a year, and drew at the rate of $1,100 until he quit the service. During this time he had ceased to be a substitute, and held rank as a full railway mail clerk. In Richmond & Danville Railroad Company v.

Elliott, 149 U. S. 266, 13 Sup. Ct. 837, 37 L. Ed. 728, it appeared that Elliott was working in the capacity of a coupler and switchman, and had been so working for between four and five years. He was getting $1.50 per day. He was asked:

"What were your prospects of advancement, if any, in your employment on the railroad, and of obtaining higher wages?"

He stated that he thought that by staying with the company he would be promoted; that there was a "system by which you go in there as coupler or train hand, or in the yard, and if a man falls out you stand a chance of taking his place"; that the average yard conductor obtained a salary of from $60 to $75 a month. The court said:

"It did not appear that there was any rule on the part of the Central Company for an increase of salary after a certain length of time, or that promotion should follow whenever a vacancy occurred in a higher grade of service. The most that was claimed was that when a vacancy took place a subordinate who had been faithful in his employment, and had served a long while, had a chance of receiving preferment. But that is altogether too problematical and uncertain to be presented to a jury in connection with proof of the wages paid to those in such superior employment. Promotion was purely a matter of speculation, depending not simply upon the occurrence of a vacancy, but upon the judgment, or even whim, of those in control."

In Brown, Administratrix, v. C., R. I. & P., 64 Iowa, 652, 21 N. W. 193, cited by the majority, it was held that where a fireman was killed it was not admissible to show that firemen, when they had sufficient experience, and had acquired the requisite skill, were sometimes employed as engineers. In Chase v. B., C. R. & N., 76 Iowa, 675, 39 N. W. 196, cited in the majority opinion, the plaintiff was a switchman. He was allowed to show that there was a line of promotion in the business in which he was engaged when injured; that the grade next to the one held by plaintiff was switch thrower, without increase of pay; that the next grade was that of yardmaster, with a salary of $100 per month; and that the next was that of trainmaster, with a further increase of salary. The court said:

"It would be contrary to well-established and approved rules of law to permit the injured person to show in aggravation of damages that promotions are made, and wages increased, in the business in which he was engaged when injured, without at least showing that he was in the direct line of promotion."

The railway mail service is under the classified civil service, and promotions and advancements in such a service are sufficiently certain to warrant the introduction of such evidence. None of the cases cited in the majority opinion seem persuasive to me that when a person is admitted to the civil service in the railway mail branch it is not admissible, in a suit by him for permanent physical disabilities, to show the well-known advancing rate of compensation to such employés; but in this case there was evidence that the claimant was actually earning $800 a year from the government as a substitute helper, and about $900 a year from other work as a musician and carpenter. When he left the service, he was a regular railway mail clerk, had

for a long time earned $1,000 a year, and was then earning $1,100 a year. No authority has been or can be cited, in my judgment, holding that this is remote or speculative.

The company then offered to show that his damages should not be estimated upon an assumption of an earning capacity of $1,100 a year, which he was receiving when he quit the government service, or $1,300, which he would have received if he had remained in the service, and, in addition, the $900 he was earning as a musician and carpenter, but that as soon as he received his appointment as a regular postal clerk he must give up his outside employment. The court properly told the jury that if he was entitled to recover the rule was compensatory, and they should consider "a permanent impairment of his ability to labor, if any, and generally any reduction in his power to labor and earn money and pursue the course of life which he might otherwise have done." This instruction was correct; but in telling the jury they might consider the reduction of the plaintiff's power to earn money they should not have been given evidence that at the time of the accident he was a substitute mail clerk, to whom the rule against outside labor had no relation whatever, and that he earned $900 a year from such outside labor, and that when he quit the government service he was getting $1,100, and exclude evidence that by his advances he was forbidden to earn any part of the $900 from outside labor, clearly leaving the impression he could then have earned $2,000 a year but for his injuries, and would have been earning $2,200 at the time of the trial, when he could have earned but $1,100 at the one time and $1,300 at the other. It seems to me perfectly clear that it was admissible to show the rule forbidding outside employment as affecting the reduction of his power to earn money from the accident. I therefore feel compelled to dissent upon that portion of the opinion.