NEWSOM, Circuit Judge, filed a concurring opinion.
 

 BRANCH, Circuit Judge, filed a concurring opinion, in which GRANT, Circuit Judge, joined.
 

 JORDAN, Circuit Judge, filed a dissenting opinion.
 

 ROSENBAUM, Circuit Judge, filed a dissenting opinion.
 

 JILL PRYOR, Circuit Judge, filed a dissenting opinion, in which WILSON, MARTIN, and JORDAN, Circuit Judges, joined.
 

 WILLIAM PRYOR, Circuit Judge:
 

 This appeal requires us to decide whether a police officer violated the Fourth Amendment when he removed a round of live ammunition and a holster from the pocket of a suspect during a protective frisk,
 
 see
 

 Terry v. Ohio
 
 ,
 
 392 U.S. 1
 
 ,
 
 88 S.Ct. 1868
 
 ,
 
 20 L.Ed.2d 889
 
 (1968). At 4:00 a.m., the officer responded to a call about a burglary in progress in a high-crime area. When the officer arrived at the scene, he saw Paul Johnson, who matched the burglar's description, standing in a dark alley. After detaining Johnson, the officer frisked him and immediately recognized that he had a round of ammunition in his pocket. The officer removed the ammunition and an empty holster covering it. He then canvassed the area and found two pistols less than a foot from where he first saw Johnson. After a grand jury indicted Johnson for being a felon in possession of a firearm and ammunition in violation of
 
 18 U.S.C. § 922
 
 (g)(1), he moved to suppress the pistols, ammunition, and holster, but the district court denied his motion. A panel of this Court reversed.
 
 United States v. Johnson
 
 ,
 
 885 F.3d 1313
 
 (11th Cir.),
 
 reh'g en banc granted, op. vacated
 
 ,
 
 892 F.3d 1155
 
 (11th Cir. 2018). We then vacated that decision and ordered rehearing en banc. We now affirm the denial of Johnson's motion to suppress because the officer was entitled to seize the ammunition to protect himself and others.
 

 I. BACKGROUND
 

 We review the facts adduced at the evidentiary hearings because they are critical to our resolution of this case. Dwight Williams, a police officer for the City of Opa-Locka, Florida, sat alone in his patrol car when a call came over his radio shortly after 4:00 a.m. on June 14, 2015. The call reported a burglary in progress at a nearby multi-family duplex and described the burglar as a black male wearing a white shirt. Officer Williams and another officer responded to the call. Officer Williams knew from experience that responding to a burglary can be dangerous because burglars are often armed.
 

 The officers arrived at the duplex and started to search for the suspected burglar. Officer Williams saw Paul Johnson, a black male wearing a white shirt standing near a fence in a dark alley at the back of the duplex. The officers asked Johnson to come toward them where they could "see him a little better." Johnson complied, and as he walked toward them, another officer arrived on the scene. The officers ordered Johnson to lie on the ground and handcuffed him. Officer Williams then began frisking Johnson.
 

 While patting down Johnson's pocket, Officer Williams felt something nylon covering "a small, round, hard object" that he immediately recognized as ammunition. He reached into Johnson's pocket and removed the round of ammunition and an empty nylon holster. The round belonged to a .380 caliber gun. Officer Williams was concerned; as he later testified, "the round that was in [Johnson's] pocket and the holster led [him] to believe that there [wa]s a weapon that [the] round goes to and something goes into that holster." Based on his experience that burglaries often involve more than one perpetrator, he was also concerned that there was "another person in an apartment [who] m[ight] come out with something."
 

 As Officer Williams searched the area for a gun, Johnson told the other officers that he had been trying to wake up his girlfriend, who lived at the duplex, by
 knocking loudly on her door. Johnson suggested that someone might have thought he was trying to break in. The officers tried to confirm Johnson's story, but his girlfriend would not answer their knock at her door.
 

 Meanwhile, Officer Williams found a hole in the fence close to where Johnson had been standing. Knowing that suspects "throw[ ]" away weapons "a lot in Opa-Locka" when they encounter the police, Officer Williams drove around the fence to see if a gun had been tossed on the other side. Sure enough, he found two pistols, one .380 caliber and the other .40 caliber, less than a foot from where the officers had first seen Johnson. Officer Williams checked the serial numbers on the pistols and determined that both had been reported as stolen.
 

 Johnson's girlfriend eventually opened her door for the officers. She confirmed that Johnson lived at the duplex with her and that he was trying to enter their home. The officers then arrested Johnson.
 

 The officers took Johnson to the police station, where he waived his rights to remain silent and to counsel,
 
 see
 

 Miranda v. Arizona
 
 ,
 
 384 U.S. 436
 
 ,
 
 86 S.Ct. 1602
 
 ,
 
 16 L.Ed.2d 694
 
 (1966). Johnson confessed that he was holding the pistols for his brother and cousin, even though he had previously been convicted of a felony. A grand jury later indicted Johnson for being a felon in possession of a firearm and ammunition,
 
 18 U.S.C. § 922
 
 (g)(1).
 

 Johnson moved to suppress the ammunition, the holster, and the pistols, along with any statements resulting from the frisk. Johnson argued that Officer Williams violated the Fourth Amendment by frisking him and by seizing the ammunition and holster. A magistrate judge held two evidentiary hearings on the motion.
 

 The officers who detained Johnson testified that Opa-Locka is a "high-crime area" that receives a "high volume of calls" involving "bodily harm done to others" and the use of firearms "in [multiple] aspects of the crimes from burglaries to robberies to home invasions." The officers testified that, in their experience, burglaries in Opa-Locka often involve more than one perpetrator. According to Officer Williams, a reported burglary presents a dangerous situation for the officers because, "when [the officers] arrive to the scene, [they] never know where the potential [suspect] may be, ... never know what [a suspect] has, [and] never know if [they] have any lighting to see the potential [suspect]." Officer Williams testified that the officers detained Johnson "because of the nature of the call and the current conditions" at the scene and to "make sure that no one else was on the premise with him." After the hearings, the magistrate judge issued a report and recommendation concluding that Officer Williams did not violate the Fourth Amendment by frisking Johnson and removing the ammunition and holster from his pocket.
 

 The district court adopted the magistrate judge's report and recommendation and denied Johnson's motion to suppress. The district court ruled that the frisk was constitutional at its inception because "Officer Williams had reasonable suspicion to believe that his safety or the safety of others was in danger." And it ruled that the removal of the ammunition and holster "was a justified continuation of the initial frisk." The district court reasoned that "[a]n officer's seizure of ammunition following a lawful frisk when investigating a possible violent crime, particularly when confronted with an unsecure scene, is sufficiently connected to officer safety not to run afoul of the Fourth Amendment." Johnson pleaded guilty but reserved his
 right to appeal the denial of his motion to suppress.
 

 A panel of this Court reversed.
 
 Johnson
 
 ,
 
 885 F.3d at 1324
 
 . The panel agreed that the frisk was constitutional at its inception because, "[c]onsidering the totality of the facts, ... Officer Williams reasonably believed that his safety, or the safety of his fellow officers, was at risk."
 

 Id.
 

 at 1322
 
 . But the panel concluded that the removal of the ammunition and holster from Johnson's pocket violated the Fourth Amendment.
 

 Id.
 

 at 1322-24
 
 . It held "the presence of a single round of ammunition-without facts supporting the presence, or reasonable expectation of the presence, of a firearm-was insufficient to justify the seizure of the bullet and the holster."
 

 Id.
 

 at 1323-24
 
 .
 

 We vacated the panel's opinion and ordered rehearing en banc. We instructed the parties to address one issue: whether Officer Williams was entitled, when he felt a round of ammunition in Johnson's pocket during a
 
 Terry
 
 frisk, to seize the ammunition and the holster.
 

 II. STANDARDS OF REVIEW
 

 We review the denial of a motion to suppress under a mixed standard of review.
 
 United States v. Clay
 
 ,
 
 483 F.3d 739
 
 , 743 (11th Cir. 2007). We review the district court's findings of fact for clear error and review the application of law to the facts
 
 de novo
 
 .
 
 United States v. Matchett
 
 ,
 
 802 F.3d 1185
 
 , 1191 (11th Cir. 2015). We view the evidence in the light most favorable to the government, as "the party that prevailed in the district court."
 

 Id.
 

 (citation and quotation marks omitted).
 

 III. DISCUSSION
 

 The Fourth Amendment guarantees "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. Amend. IV. "[R]easonableness is always the touchstone of Fourth Amendment analysis,"
 
 Birchfield v. North Dakota
 
 , --- U.S. ----,
 
 136 S.Ct. 2160
 
 , 2186,
 
 195 L.Ed.2d 560
 
 (2016), because "what the Constitution forbids is not all searches and seizures, but unreasonable searches and seizures,"
 
 Terry
 
 ,
 
 392 U.S. at 9
 
 ,
 
 88 S.Ct. 1868
 
 (quoting
 
 Elkins v. United States
 
 ,
 
 364 U.S. 206
 
 , 222,
 
 80 S.Ct. 1437
 
 ,
 
 4 L.Ed.2d 1669
 
 (1960) ).
 

 When an officer reasonably believes that a suspect threatens his safety or the safety of others, he may search the suspect and seize concealed objects that he reasonably believes may be weapons or other instruments of assault.
 
 See
 

 Terry
 
 ,
 
 392 U.S. at 27, 29
 
 ,
 
 88 S.Ct. 1868
 
 . To frisk a suspect, an officer "conduct[s] a carefully limited search of the outer clothing of [the suspect] ... to discover weapons which might be used to assault him."
 

 Id.
 

 at 30
 
 ,
 
 88 S.Ct. 1868
 
 . And if an officer "feels a concealed object that he reasonably believes may be a weapon," he may continue the search beyond the outer clothing "by searching [the suspect's] pocket" and removing the concealed object.
 
 Clay
 
 ,
 
 483 F.3d at 743-44
 
 .
 

 "The sole justification of the search [of a suspect] is the protection of the police officer and others nearby,"
 
 Terry
 
 ,
 
 392 U.S. at 29
 
 ,
 
 88 S.Ct. 1868
 
 , so a frisk must remain "reasonably related in scope to the circumstances which justified the [frisk] in the first place,"
 

 id.
 

 at 20
 
 ,
 
 88 S.Ct. 1868
 
 . A frisk "reasonably designed to discover guns, knives, clubs, or other hidden instruments for the assault of the police officer" does not exceed its permissible scope.
 

 Id.
 

 at 29
 
 ,
 
 88 S.Ct. 1868
 
 .
 

 When we consider "the limitations which the Fourth Amendment places upon a protective seizure and search for
 weapons[,] ... [we consider] the concrete factual circumstances of [the] individual case[ ]."
 

 Id.
 

 We ask "whether a reasonably prudent man in the circumstances would be warranted in the belief that his safety or that of others was in danger."
 

 Id.
 

 at 27
 
 ,
 
 88 S.Ct. 1868
 
 . In this inquiry, "the totality of the circumstances-the whole picture-must be taken into account."
 
 United States v. Cortez
 
 ,
 
 449 U.S. 411
 
 , 417,
 
 101 S.Ct. 690
 
 ,
 
 66 L.Ed.2d 621
 
 (1981). "[This] process does not deal with hard certainties, but with probabilities."
 

 Id.
 

 at 418
 
 ,
 
 101 S.Ct. 690
 
 . Circumstances that we consider include the time of day, the location of the scene, the lighting at the scene, the number of officers, and the nature of the alleged crime.
 
 See
 

 United States v. Griffin
 
 ,
 
 696 F.3d 1354
 
 , 1359-60 (11th Cir. 2012) ;
 
 see, e.g.
 
 ,
 
 United States v. Moore
 
 ,
 
 817 F.2d 1105
 
 , 1108 (4th Cir. 1987) ("The hour was late, the street was dark, the officer was alone, and the suspected crime was a burglary, a felony that often involves the use of weapons."). We must assess the totality of the circumstances, "not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."
 
 Cortez
 
 ,
 
 449 U.S. at 418
 
 ,
 
 101 S.Ct. 690
 
 .
 

 Consider the "concrete factual circumstances" that Officer Williams encountered. When Officer Williams received the call about a burglary in progress at 4:00 a.m., he was patrolling a "high-crime area" that receives a "high volume of calls" involving "bodily harm done to others" by guns. At the scene, Officer Williams saw Johnson, who matched the burglar's description, standing in a dark alley. And the scene was not yet secure.
 
 See
 

 Griffin
 
 ,
 
 696 F.3d at 1359
 
 (taking into account that an officer "had not finished investigating the alleged attempted theft"). Officer Williams knew both that burglars in Opa-Locka were often armed and that they often worked with other perpetrators. When Officer Williams immediately recognized the ammunition in Johnson's pocket during the frisk, he "neutralize[d] the threat of physical harm" by removing the ammunition from Johnson's pocket.
 
 Terry
 
 ,
 
 392 U.S. at 24
 
 ,
 
 88 S.Ct. 1868
 
 .
 

 As an essential part of a lethal weapon, Johnson's ammunition threatened the safety of Officer Williams and others in this circumstance. Although Johnson argues that his ammunition, by itself, posed no danger to the safety of Officer Williams or others, his argument fails to appreciate the grave injury that could have been caused by his ammunition if it had been loaded into a gun. Johnson compares ammunition to "a pebble, marble, coin, gemstone, ball bearing, or rock of crack cocaine." But even Johnson acknowledges a crucial difference between those other objects and a round of live ammunition: the round of ammunition is designed to become a deadly projectile. Ammunition is not a gun, but it is an integral part of what makes a gun lethal.
 

 Examining Johnson's ammunition also could have assisted Officer Williams's search for a .380 caliber gun that he had good reason to believe was in the vicinity of the unsecure scene of a reported burglary in a high-crime area late at night. When Officer Williams discovered ammunition in Johnson's pocket, he had reason to believe a gun was in the vicinity because "[c]ommon sense and logic dictate that a bullet is often associated with a gun."
 
 People v. Colyar
 
 ,
 
 374 Ill.Dec. 880
 
 ,
 
 996 N.E.2d 575
 
 , 585 (Ill. 2013). And Officer Williams's removal of the ammunition could have informed him of what caliber or type of gun might be nearby. True, he could not use the frisk to gather evidence because a frisk must remain "[ ]related to the sole justification of the search under
 
 Terry
 
 : the protection of the police officer and others
 nearby."
 
 Minnesota v. Dickerson
 
 ,
 
 508 U.S. 366
 
 , 378,
 
 113 S.Ct. 2130
 
 ,
 
 124 L.Ed.2d 334
 
 (1993) (alterations adopted) (citation and quotation marks omitted). But seizing the ammunition in Johnson's pocket did not "amount[ ] to the sort of evidentiary search that
 
 Terry
 
 expressly refused to authorize"; in this circumstance, it instead amounted to the sort of protective search that
 
 Terry
 
 permits because Officer Williams had to find any gun to secure the scene and protect himself and others.
 

 Id.
 

 We reject Judge Jill Pryor's suggestion that a safety measure within the scope of
 
 Terry
 
 's rationale becomes a " 'condemned' evidentiary search[ ]" whenever it
 
 also
 
 provides the officers with new information. Jill Pryor Dissenting Op. at 1031 (quoting
 
 Dickerson
 
 ,
 
 508 U.S. at 378
 
 ,
 
 113 S.Ct. 2130
 
 ).
 

 That an officer may seize ammunition when it threatens the safety of officers and others has long been the settled precedent in several jurisdictions. For example, in
 
 United States v. Ward
 
 , the Eighth Circuit ruled that an officer who believed that cylindrical objects in a suspect's pocket were shotgun shells "was justified in reaching into the pocket to retrieve them."
 
 23 F.3d 1303
 
 , 1306 (8th Cir. 1994). In
 
 Scott v. State
 
 , the Supreme Court of Nevada ruled that, after seizing a gun, an officer may remove ammunition from a suspect's pocket because "[i]t is reasonable for an officer, as a precautionary measure, to retrieve and separate from a suspect during the course of a
 
 Terry
 
 stop and frisk, either weapons or ammunition or both."
 
 110 Nev. 622
 
 ,
 
 877 P.2d 503
 
 , 509 (1994). In
 
 State v. Smith
 
 , the Supreme Court of Arizona held that an officer reasonably seized "the contents of Smith's pockets which were bulging with shotgun ammunition."
 
 136 Ariz. 273
 
 ,
 
 665 P.2d 995
 
 , 998 (1983) (en banc). And in
 
 Colyar
 
 , the Supreme Court of Illinois ruled that an officer who saw ammunition in a car "could reasonably suspect the presence of a gun, thus implicating officer safety," and could seize the ammunition.
 
 374 Ill.Dec. 880
 
 ,
 
 996 N.E.2d at 585, 587
 
 .
 
 See also
 

 State v. Moton
 
 ,
 
 733 S.W.2d 449
 
 , 451 (Mo. Ct. App. 1986) (holding that officer's seizure of 13 rounds of ammunition during a frisk was lawful);
 
 People v. Lewis
 
 ,
 
 123 A.D.2d 716
 
 ,
 
 507 N.Y.S.2d 80
 
 , 81 (1986) (holding that officer responding to a call about armed robbery was entitled to seize ammunition and a gun from a suspect who was driving a car that matched the description of the robber's car). Indeed, we are aware of no precedential opinion to the contrary in any jurisdiction.
 

 Judge Jill Pryor suggests that "a couple of" federal-court decisions "cut against" our holding, Jill Pryor Dissenting Op. at 1029, but we are not persuaded. In
 
 United States v. Miles
 
 , the Ninth Circuit held that an officer exceeded
 
 Terry
 
 's limits by shaking a small box of bullets in a suspect's pocket because the contents of the box were not immediately apparent to the officer.
 
 247 F.3d 1009
 
 , 1015 (9th Cir. 2001). By contrast, Officer Williams testified that, when he felt the object in Johnson's pocket, he "immediately thought it was ammunition." And in
 
 United States v. Lemons
 
 , the Eastern District of Wisconsin ruled that "ammunition alone cannot be considered contraband"-an issue not presented by this appeal.
 
 153 F.Supp.2d 948
 
 , 960 (E.D. Wis. 2001) ;
 
 see also
 

 id.
 

 at 957
 
 (finding that the officer who conducted the frisk "did not immediately recognize the items as bullets"). Apart from describing ammunition as a "nonweapon[ ]," the district court did not consider whether or in what circumstances an officer might be justified in seizing it as a safety measure.
 

 Id.
 

 at 959
 
 . Nor can we overlook that the opinion of a district court is not precedential.
 
 Camreta v. Greene
 
 ,
 
 563 U.S. 692
 
 , 709 n.7,
 
 131 S.Ct. 2020
 
 ,
 
 179 L.Ed.2d 1118
 
 (2011) ("A decision of a federal district court judge is not binding precedent ...."
 

 (citation and internal quotation marks omitted));
 
 accord
 
 Bryan A. Garner al.,
 
 The Law of Judicial Precedent
 
 § 29, at 255 (2016).
 

 Johnson argues that, because the scope of a frisk is limited to a search for weapons and ammunition is not a weapon, Officer Williams was not entitled to remove the ammunition from his pocket. But Johnson reads
 
 Terry
 
 as if the central question it posed were whether a given object qualifies as a "weapon" in the abstract and not whether removing and securing the object is reasonably related to "the protection of the police officer and others nearby,"
 
 392 U.S. at 29
 
 ,
 
 88 S.Ct. 1868
 
 . In
 
 Terry
 
 , the Supreme Court contemplated that an officer could, of course, remove "guns, knives, [and] clubs," but it never limited a frisk to those specified weapons.
 

 Id.
 

 Instead of creating a laundry list of particular objects that an officer may remove during a frisk, the Supreme Court explained that "[t]hese limitations will have to be developed in the concrete factual circumstances of individual cases."
 

 Id.
 

 And when applying
 
 Terry
 
 in individual cases, we have ruled that officers are entitled to seize a variety of items that are not traditional weapons.
 
 See, e.g.
 
 ,
 
 Clay
 
 ,
 
 483 F.3d at 743
 
 (holding that an officer lawfully seized a "long, thin object," which turned out to be the empty barrel of a ballpoint pen, because he thought it "might be a screwdriver or something similar that could be used as a weapon"). After all,
 
 Terry
 
 explained that an officer can also remove "other hidden instruments for the assault of the police officer."
 
 392 U.S. at 29
 
 ,
 
 88 S.Ct. 1868
 
 ;
 
 see also
 

 Sibron v. New York
 
 ,
 
 392 U.S. 40
 
 , 65,
 
 88 S.Ct. 1889
 
 ,
 
 20 L.Ed.2d 917
 
 (1968) (
 
 Terry
 
 's companion case also ruling that an officer may remove "concealed objects which might be used as instruments of assault").
 

 In considering a frisk's proper scope, we cannot isolate
 
 Terry
 
 's references to "weapons" from the "sole justification" for the frisk: "the protection of the police officer and others nearby." 392 U.S. at 29,
 
 88 S.Ct. 1868
 
 . To be sure, the scope of a frisk must be "carefully limited" to serve that justification,
 

 id.
 

 at 30
 
 ,
 
 88 S.Ct. 1868
 
 , but it must not be so limited that officers cannot take reasonable actions in furtherance of their own safety and that of others. As the
 
 Terry
 
 Court made clear, we cannot "deny the officer the power to take necessary measures ... to neutralize the threat of physical harm."
 

 Id.
 

 at 24
 
 ,
 
 88 S.Ct. 1868
 
 . In short, during a
 
 Terry
 
 frisk, an officer may remove ammunition from a suspect when the removal is reasonably related to the protection of the officers and others nearby.
 
 See
 

 id.
 

 at 19-20
 
 ,
 
 88 S.Ct. 1868
 
 .
 

 Johnson argues that "the way to defuse the potential danger [posed by ammunition] is to locate and seize the firearm that might be present," but we cannot, with hindsight, dictate best practices for police officers. "A creative judge engaged in
 
 post hoc
 
 evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished."
 
 United States v. Sharpe
 
 ,
 
 470 U.S. 675
 
 , 686-87,
 
 105 S.Ct. 1568
 
 ,
 
 84 L.Ed.2d 605
 
 (1985). Instead of imagining other ways to defuse the danger posed by ammunition, we assess only whether an officer acted reasonably in his circumstance.
 
 See
 
 id.
 

 Officer Williams acted reasonably when he seized the ammunition and holster in Johnson's pocket. He was entitled to "tak[e] steps to assure" himself that the ammunition in Johnson's pocket would not be loaded into "a weapon that could ... fatally be used against [him]."
 
 Maryland v. Buie
 
 ,
 
 494 U.S. 325
 
 , 333,
 
 110 S.Ct. 1093
 
 ,
 
 108 L.Ed.2d 276
 
 (1990) (discussing the protection concerns that animate a
 
 Terry
 
 frisk). When Officer Williams seized the ammunition and empty holster, he had every reason
 to expect that a matching gun was nearby. Officer Williams even testified that the ammunition in Johnson's pocket "led [him] to believe that there [wa]s a weapon that [the] round goes to and something goes into that holster." And he explained that suspects "throw[ ]" away weapons "a lot in Opa-Locka" when they encounter the police. When Officer Williams found only a single round of ammunition in Johnson's pocket, he was left to fear where other ammunition may be, especially a round already loaded into a gun's chamber.
 

 That Johnson was handcuffed when he was frisked did not eliminate the danger posed by the ammunition. The Supreme Court has rejected as "mistaken" the argument that officers cannot reasonably fear for their safety when a suspect "was effectively under [the officers'] control during the investigative stop and could not get access to any weapons that might have been located [nearby]."
 
 Michigan v. Long
 
 ,
 
 463 U.S. 1032
 
 , 1051,
 
 103 S.Ct. 3469
 
 ,
 
 77 L.Ed.2d 1201
 
 (1983). Handcuffs do not always work, and suspects have been known to reach for weapons even when handcuffed.
 
 See
 

 United States v. Sanders
 
 ,
 
 994 F.2d 200
 
 , 209-10 (5th Cir. 1993) (rejecting the argument "that, by handcuffing a suspect, the police instantly and completely eliminate all risks that the suspect will ... do them harm").
 

 When Johnson was stopped and frisked, the officers had not found a gun on the scene, did not know how many or what kind of guns might be on the scene, and did not know whether others, who were not handcuffed, participated in the burglary and were still lurking in the area. But the officers did know, based on their experience, that burglaries in Opa-Locka often involve guns and often involve more than one person. "In view of these facts, we cannot blind ourselves to the need for law enforcement officers to protect themselves ...."
 
 Terry
 
 ,
 
 392 U.S. at 24
 
 ,
 
 88 S.Ct. 1868
 
 .
 

 Although Johnson argues that
 
 Terry
 
 is inconsistent with the original meaning of the Fourth Amendment and that we should apply it narrowly to "limit[ ] the damage," we must apply Supreme Court precedent neither narrowly nor liberally-only faithfully. Johnson appeals to Justice Scalia's expressed doubts about
 
 Terry
 
 ,
 
 see
 

 Dickerson
 
 ,
 
 508 U.S. at 382
 
 ,
 
 113 S.Ct. 2130
 
 (Scalia, J., concurring) (opining that
 
 Terry
 
 did not discuss "the original state of the law" and instead represents "the original-meaning-is-irrelevant, good-policy-is-constitutional-law school of jurisprudence"), though Justice Scalia also recognized that a frisk might have been "considered permissible" when the Fourteenth Amendment was adopted or might otherwise be considered "reasonable" now,
 

 id.
 

 But when "a precedent of [the Supreme] Court has direct application," we must follow it.
 
 Rodriguez de Quijas v. Shearson/Am. Express, Inc.
 
 ,
 
 490 U.S. 477
 
 , 484,
 
 109 S.Ct. 1917
 
 ,
 
 104 L.Ed.2d 526
 
 (1989).
 

 To be sure, in several areas, the Supreme Court has considered the original meaning of the Fourth Amendment.
 
 See, e.g.
 
 ,
 
 Virginia v. Moore
 
 ,
 
 553 U.S. 164
 
 , 168,
 
 128 S.Ct. 1598
 
 ,
 
 170 L.Ed.2d 559
 
 (2008) (original understanding of an officer's authority to arrest a suspect);
 
 United States v. Ramsey
 
 ,
 
 431 U.S. 606
 
 , 616,
 
 97 S.Ct. 1972
 
 ,
 
 52 L.Ed.2d 617
 
 (1977) (original understanding of border searches). And we have followed its approach in those areas.
 
 See, e.g.
 
 ,
 
 United States v. Touset
 
 ,
 
 890 F.3d 1227
 
 , 1232 (11th Cir. 2018) (quoting
 
 Ramsey
 
 ,
 
 431 U.S. at 616-17
 
 ,
 
 97 S.Ct. 1972
 
 );
 
 United States v. Phillips
 
 ,
 
 834 F.3d 1176
 
 , 1179-80 (11th Cir. 2016) (quoting
 
 Moore
 
 ,
 
 553 U.S. at 168
 
 ,
 
 128 S.Ct. 1598
 
 ). We also have determined the original meaning of other constitutional provisions to resolve questions of first impression.
 
 See, e.g.
 
 ,
 
 United States v. Campbell
 
 ,
 
 743 F.3d 802
 
 , 810-11 (11th Cir. 2014) (original understanding of "Felonies committed on the high Seas");
 
 United States v. Bellaizac-Hurtado
 
 ,
 
 700 F.3d 1245
 
 , 1249-51, 1254 (11th Cir. 2012) (original understanding of "Offences against the Law of Nations"). But
 
 Terry
 
 -the precedent that directly controls-explained that we must consider the need to protect officer safety when evaluating the scope of a frisk without mention of original meaning.
 
 See
 

 Terry
 
 , 392 U.S. at 29,
 
 88 S.Ct. 1868
 
 .
 

 We cannot use originalism as a makeweight when applying that analytic framework. Nor can we promise that Johnson would like the result if we
 
 did
 
 have the authority to approximate originalist outcomes by selectively trimming binding precedent around the edges.
 
 See, e.g.
 
 ,
 
 Collins v. Virginia
 
 , --- U.S. ----,
 
 138 S.Ct. 1663
 
 , 1676-77,
 
 201 L.Ed.2d 9
 
 (2018) (Thomas, J., concurring) (explaining that the law during the Founding period did not exclude illegally seized evidence and indeed "sometimes reflected the inverse of the exclusionary rule" because "that someone turned out to be guilty could
 
 justify
 
 an illegal seizure") (citing
 
 Gelston v. Hoyt
 
 ,
 
 3 Wheat. 246
 
 , 310,
 
 16 U.S. 246
 
 ,
 
 4 L.Ed. 381
 
 (1818) (Story, J.); 2 William Hawkins,
 
 A Treatise of the Pleas of the Crown
 
 77 (1721));
 
 see also
 

 Janus v. AFSCME
 
 , --- U.S. ----,
 
 138 S.Ct. 2448
 
 , 2470,
 
 201 L.Ed.2d 924
 
 (2018) (rejecting the "halfway originalism" of parties who appeal to the original meaning "only when it suits them"). And we cannot use a halfway theory of judicial precedent to cut back on
 
 Terry
 
 while faithfully adhering to the exclusionary rule. As an "inferior" court, U.S. Const. Art. III, § 1, we have no such authority: "The
 
 only
 
 Court that can properly cut back on Supreme Court decisions is the Supreme Court itself."
 
 Prison Legal News v. Sec'y, Fla. Dep't of Corr.
 
 ,
 
 890 F.3d 954
 
 , 966 (11th Cir. 2018) (emphasis added).
 

 Judges Rosenbaum and Jill Pryor, in dissent, level an attack against an opinion that we have not issued. According to Judge Rosenbaum's dissent, "we hold that any ammunition may
 
 always
 
 be seized during a frisk," Rosenbaum Dissenting Op. at 1012 (emphasis added), and so transform the totality-of-the-circumstances test into a "brand new rule,"
 

 id.
 

 at 1022
 
 .
 
 See also
 
 Jill Pryor Dissenting Op. at 1029-31. But we cannot decide whether Officer Williams was entitled to seize an object for his protection without considering the nature of that object. By discussing facts about ammunition, we do not create a categorical rule that ammunition may always be seized. Indeed, our concurring colleagues understand that we have not done so and write separately to explain that they prefer that we
 
 would
 
 adopt such a categorical rule. Newsom Concurring Op. at 1004; Branch Concurring Op. at 1009. And contrary to Judge Rosenbaum's accusation, we create no alternative holding, "stealth" or otherwise. Rosenbaum Dissenting Op. at 1019;
 
 see
 
 Garner et al.,
 
 The Law of Judicial Precedent
 
 § 10, at 128-29 ("[I]t's improper for a later court to infer an alternative holding or rationale where none is sufficiently expressed in the precedent.").
 

 Judge Rosenbaum also accuses us of circumventing the adversarial process by addressing an issue "that we did not ask the parties to address, that neither party briefed, and that the government expressly declined to adopt at oral argument," Rosenbaum Dissenting Op. at 1012, but even a cursory review of the en banc issue, briefs, and oral argument proves this assertion wrong. We asked the parties to address one issue: "When he felt a round of ammunition in Paul Johnson Jr.'s pocket during a
 
 Terry
 
 frisk, was Officer Dwight
 Williams entitled to seize the ammunition and a nylon holster from Johnson's pocket?" In his brief, Johnson argued that Officer Williams was not entitled to seize the ammunition from his pocket because "the bullet in this particular case posed no conceivable threat to officer safety." The government argued in its brief that "Officer Williams was justified in retrieving the bullet because a reasonable officer under the circumstances could conclude that the bullet [wa]s an instrument of assault that could pose a danger to himself and other[s]." After oral argument, we now answer that question in the affirmative. Notably, although she styles her opinion as a "dissent," Judge Rosenbaum refuses to answer the one question-she deems it "non-en banc worthy"-that a majority of this Court voted to decide en banc. Rosenbaum Dissenting Op. at 1023. So, unlike Judge Rosenbaum, we answer the very question the parties briefed and argued-nothing more and nothing less.
 

 "The language of a judicial decision must be interpreted with reference to the circumstances of the particular case and the question under consideration." Garner et al.,
 
 The Law of Judicial Precedent
 
 § 6, at 80. "As binding authority, [a] judicial decision[ ] is inherently limited to the facts of the case then before the court and the questions presented to the court in the light of those facts."
 
 New Port Largo, Inc. v. Monroe Cty.
 
 ,
 
 985 F.2d 1488
 
 , 1499 (11th Cir. 1993) (Edmondson, J., concurring in the judgment). As Chief Justice John Marshall explained long ago, "[i]t is a maxim not to be disregarded, that general expressions, in every opinion, are to be taken in connection with the case in which those expressions are used."
 
 Cohens v. Virginia
 
 , 19 U.S. (6 Wheat.) 264, 399,
 
 5 L.Ed. 257
 
 (1821) ;
 
 see also
 

 Armour & Co. v. Wantock
 
 ,
 
 323 U.S. 126
 
 , 133,
 
 65 S.Ct. 165
 
 ,
 
 89 L.Ed. 118
 
 (1944) ("[W]ords of our opinions are to be read in the light of the facts of the case under discussion.").
 

 To be sure, the reasoning of our decision generates a principle of law, the application of which extends beyond the factual circumstances of this appeal. That result does not arise from an abandonment of the fact-bound inquiry prescribed by
 
 Terry
 
 , but instead reflects how a totality-of-the-circumstances test works when reviewing a stop and frisk. Correctly understood, the output of a totality-of-the-circumstances inquiry is
 
 necessarily
 
 a conditional legal principle: by deciding that particular circumstances mandate a particular result, a court adopts a principle that if materially similar circumstances obtain, the same result must follow. In other words, there is no either-or choice between formulating an abstract principle of law and applying a totality-of-the-circumstances test. Applying the latter yields the former, which is all that we have done to resolve this appeal. We have adopted the principle that if an officer conducts a lawful
 
 Terry
 
 stop and frisk in materially similar circumstances, then that officer is entitled to seize ammunition from the suspect.
 

 We have neither jettisoned
 
 Terry
 
 's totality-of-the-circumstances approach in favor of a categorical rule nor resolved a question that we did not ask the parties to address. In resolving the question we posed, we necessarily adopt a principle with potential application to future cases. But the principle is not
 
 universally
 
 applicable because it is tethered to the concrete factual circumstances of Johnson's stop and frisk. And we cannot indulge our dissenting colleague's call for an explanation of how "courts will be able to reach any other conclusions in cases involving any ammunition, regardless of any other circumstances," Rosenbaum Dissenting Op. at 1016, because "[w]e are not in the business of issuing advisory opinions ... that
 merely opine on 'what the law would be upon a hypothetical state of facts.' "
 
 Gagliardi v. TJCV Land Tr.
 
 ,
 
 889 F.3d 728
 
 , 733 (11th Cir. 2018) (quoting
 
 Chafin v. Chafin
 
 ,
 
 568 U.S. 165
 
 , 172,
 
 133 S.Ct. 1017
 
 ,
 
 185 L.Ed.2d 1
 
 (2013) ).
 

 Officer Williams's frisk remained "reasonably related in scope to the circumstances which justified the [frisk] in the first place."
 
 Terry
 
 , 392 U.S. at 20,
 
 88 S.Ct. 1868
 
 . Officer Williams encountered an unsecure scene, late at night, in a high-crime area, while investigating a reported burglary. Officer Williams's removal of the ammunition and holster was reasonably related to the protection of the officers and others. We hold that Officer Williams did not violate Johnson's Fourth Amendment rights by removing the ammunition and holster from his pocket during the frisk.
 

 IV. CONCLUSION
 

 We
 
 AFFIRM
 
 Johnson's judgment of conviction and sentence.