WILLIAM PRYOR, Circuit Judge, concurring:
Obviously, I join the panel opinion in full. I write separately to express some concerns about our puzzling opinion in United States v. Takhalov , 827 F.3d 1307 (11th Cir.), modified on denial of reh'g , 838 F.3d 1168 (11th Cir. 2016). In Takhalov , we held that the district court committed reversible error when it failed to instruct the jury that the defendants' "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, [was] not sufficient to convict" them of wire fraud. Id. at 1311 (first alteration in original). But our opinion sends mixed signals about precisely what we thought the proposed instruction meant in context, and it endorsed a narrow construction of the phrase "scheme or artifice to defraud," 18 U.S.C. § 1343, that is difficult to understand. That statutory phrase incorporates the "well-settled," traditional common-law meaning of "actionable 'fraud.' " Neder v. United States , 527 U.S. 1, 22, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). Our conclusion in Takhalov that it "refers only to those schemes in which a defendant lies about the nature of the bargain itself," "primar[il]y" by misrepresenting "the price" or "the characteristics of the good," 827 F.3d at 1314, has no obvious basis in the common law of fraud. Indeed, depending on how our opinion is interpreted, its analysis may well be at odds with both the common law and binding precedent. In future prosecutions under the federal criminal-fraud statutes, the bench and bar should exercise due care in interpreting our opinion in Takhalov and determining its precedential value.
The Supreme Court has made clear that the statutory phrase "scheme or artifice to defraud"-a staple of the federal criminal-fraud statutes, see, e.g. , 18 U.S.C. § 1341 (mail fraud); id. § 1344 (bank fraud)-incorporates the traditional common-law meaning of fraud. "[W]hen Congress enacted the [various] fraud ... statutes, actionable 'fraud' had a well-settled meaning at common law." Neder , 527 U.S. at 22, 119 S.Ct. 1827. And "we must presume " "that Congress intend[ed] to incorporate [that] well-settled meaning." Id. at 23, 119 S.Ct. 1827 ; see also Antonin Scalia & Bryan A. Garner, Reading Law: The Interpretation of Legal Texts § 53, at 320 (2012) ("A statute that uses a common-law term, without defining it, adopts its common-law meaning."). After all, "[w]hen a statutory term is 'obviously transplanted from another legal source,' it 'brings the old soil with it.' " Taggart v. Lorenzen , --- U.S. ----, 139 S. Ct. 1795, 1801, 204 L.Ed.2d 129 (2019) (some internal quotation marks omitted) (quoting indirectly Felix Frankfurter, *1266 Some Reflections on the Reading of Statutes , 47 Colum. L. Rev. 527, 537 (1947)). And few legal terms, if any, have deeper common-law roots than "fraud" and its derivatives. See generally 2 Matthew Bacon, A New Abridgment of the Law 593-612 (1736); see also Weiss v. United States , 122 F.2d 675, 681 (5th Cir. 1941) (observing that fraud "is as old as falsehood and as versable as human ingenuity").
Although common-law authorities state the elements of actionable fraud in slightly different ways, all agree on the following "fairly exact meaning":
[A] false representation of a material fact made by one who knew that it was false or in some cases ... when he knew that he had not information sufficient to warrant his belief in the truth of such statement, made to one who did not know that it was false, with intent to deceive such person and to influence his action, which did deceive such person and influence his action to his damage.
1 William Herbert Page, The Law of Contracts § 217, at 320-21 (2d ed. 1920) [hereinafter Page on Contracts ]; see also W. Page Keeton et al., Prosser and Keeton on the Law of Torts § 105, at 728 (5th ed. 1984) [hereinafter Prosser and Keeton on Torts ]; Restatement (Second) of Contracts § 162 (1981) ; Restatement (Second) of Torts §§ 525 - 26 (1977) ; 2 James Fitzjames Stephen, A History of the Criminal Law of England 121-22 (1883); 1 Joseph Story, Commentaries on Equity Jurisprudence § 192, at 201 (1836). This set of elements defines fraud both when it is used as a sword, as in the tort claim of deceit, see Restatement (Second) of Torts § 525, and when it is used as a shield, for instance, to avoid a contract, see Restatement (Second) of Contracts § 164. See 37 Am. Jur. 2d Fraud and Deceit § 368, at 408 (2013) ("The essentials of actionable fraud are generally the same for setting it up as a defense as for asserting it as the basis of an action for damages." (footnotes omitted)); 1 Page on Contracts § 217, at 321 (explaining that " 'fraud' ... has substantially the same elements" in contract as in tort).
Consistent with this common-law definition, the words "to defraud" in the federal fraud statutes "signify the deprivation of something of value by trick, deceit, chicane or overreaching"; in other words, "[t]hey refer ... to wronging one in his property rights by dishonest methods or schemes." Hammerschmidt v. United States , 265 U.S. 182, 188, 44 S.Ct. 511, 68 L.Ed. 968 (1924). Indeed, the only way in which the phrase "scheme or artifice to defraud" differs from actionable fraud at common law follows from the phrase itself: because the statutes address "the 'scheme to defraud,' rather than the completed fraud, the elements of [actual] reliance and damage would clearly be inconsistent with the statutes Congress enacted." Neder , 527 U.S. at 25, 119 S.Ct. 1827. That is, whether a defendant has schemed to defraud-and so violated the fraud statutes-does not depend on the success of his scheme or its consequences. See United States v. Brown , 79 F.3d 1550, 1557 n.12 (11th Cir. 1996), overruled on other grounds by United States v. Svete , 556 F.3d 1157 (11th Cir. 2009) (en banc). In this respect, the statutes punish frauds that would not have been "actionable" at common law. See United States v. Rowe , 56 F.2d 747, 749 (2d Cir. 1932) (Hand, J.) ("Civilly of course the action would fail without proof of damage, but that has no application to criminal liability."); see also Pasley v. Freeman (1789) 100 Eng. Rep. 450, 453 (KB) (opinion of Buller, J.) ("Fraud without damage, or damage without fraud, gives no cause of action; but where these two concur, an action lies."). But as far as the scheme itself is concerned-that is, the acts that the defendant intends to perform and the consequences he intends to result from *1267 them-the word "defraud" retains its "well-settled" common-law meaning. Neder , 527 U.S. at 22, 119 S.Ct. 1827 ; see also Svete , 556 F.3d at 1162-65 (drawing on common-law sources to hold that a representation need not be objectively reliable to satisfy the materiality element of the phrase "scheme or artifice to defraud").
Takhalov is difficult to square with this common-law backdrop. To be sure, the bottom-line holdings of Takhalov are straightforward enough. We held that the district court reversibly erred when it declined the defendants' request for the following jury instruction: "Failure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense." 827 F.3d at 1311 (alterations omitted or adopted). That is, we held that the instruction was "a correct statement of the law," id. at 1315-16 ; that it dealt with a critical matter raised at the trial, see id. at 1316-17 ; that it was not substantially covered by the district court's other instructions to the jury about the elements of wire fraud, see id. at 1317-20 ; and that the failure of the district court to give the instruction was not harmless beyond a reasonable doubt, id. at 1320-25.
Although the holdings of Takhalov may be easy to understand, its reasoning is less so. Before examining the opinion, consider the jury instruction itself. On its face, the proposition that "[f]ailure to disclose the financial arrangement between the B-girls and the Bar, in and of itself, is not sufficient to convict a defendant of any offense" is obviously correct. After all, a mere "failure to disclose" information is typically insufficient to satisfy even the misrepresentation element of fraud. For nondisclosure to be equivalent to a misrepresentation, it must be coupled with special circumstances, such as a confidential relationship between the parties or a course of affirmative representations making the omission misleading, that justify the imposition of a duty to disclose. See Prosser and Keeton on Torts § 106, at 737-40; 37 Am. Jur. 2d Fraud and Deceit § 194, at 235-37. And even when it is tantamount to a misrepresentation, a failure to disclose is never "in and of itself" sufficient to prove a scheme to defraud; the misrepresentation must also be material, made with scienter, and intended to induce detrimental reliance.
But our opinion in Takhalov reads as if we equated the requested jury instruction with one about the insufficiency of affirmative misrepresentations concededly made with the intent to influence customers, and it appears to equivocate about what precisely we thought the defendants had intended. At first glance, many passages in the opinion suggest that we understood the instruction to mean that the defendants would not have schemed to defraud if the only way they intended the concealment of the B-girls' employment status to affect customers was by influencing them merely to set foot in the nightclubs. See, e.g. , 827 F.3d at 1310-11 (narrating that the defendants "tricked men to come into the defendants' clubs" and "admitted that they knew the B-girls concealed their relationship with the clubs to persuade the men to go to the clubs"); id. at 1311 (narrating that the defendants "knew the B-girls were posing as tourists to get the men to come to the clubs with them"); id. (referring to "the lies that the B-girls used to get the men to come into the clubs in the first place"); id. at 1316 & n.8 (referring to the B-girls' "tricking the victims into coming to the bar[s]" and "tricking the victims into entering the bar[s]"); id. at 1318 (describing the defendants' defense theory as being that they "intended to deceive the victims in only one way-by tricking them into coming to the bars"); id. at 1319 ("[A] scheme to trick patrons to come into a *1268 bar-without more-is not wire fraud."). Were that all the instruction meant, it would again be obviously correct. To trick someone into merely crossing the threshold of a commercial establishment is a way of influencing his behavior by deceit, but it does not-by itself-"wrong[ ] [him] in his property rights," Hammerschmidt , 265 U.S. at 188, 44 S.Ct. 511. Until a transaction occurs, no property rights have been affected.
Despite the many passages that support this narrow reading of the instruction, other passages suggest that we took it to mean something more: that the defendants would not have schemed to defraud even if they intended the concealment of the B-girls' employment status to affect customers both by inducing them to set foot in the clubs and by inducing them to buy drinks once they were there. See Takhalov , 827 F.3d at 1310 (paraphrasing the instruction: "that [the jurors] must acquit if they found that the defendants had tricked the victims into entering a transaction but nevertheless gave [them] exactly what they asked for and charged them exactly what they agreed to pay"); id. at 1316 (paraphrasing the instruction: "that [the jurors] could convict only if they found that the defendants had schemed to lie about the quality or price of the goods sold to the victims"). Indeed, this interpretation seems necessary to explain what appears to be an important part of our discussion.
In Part II.A.1 of our opinion, we discussed the meaning of the phrase "scheme or artifice to defraud." See id. at 1312-15. We reasoned that "a schemer who tricks someone to enter into a transaction has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick." Id. at 1313. We pursued this train of thought through a series of hypotheticals in each of which a party intended to bring about a transaction, see id. at 1313-14, and from which we drew the following conclusions:
Thus, a "scheme to defraud," as that phrase is used in the wire-fraud statute, refers only to those schemes in which a defendant lies about the nature of the bargain itself. That lie can take two primary forms: the defendant might lie about the price (e.g. , if he promises that a good costs $10 when it in fact costs $20) or he might lie about the characteristics of the good (e.g. , if he promises that a gemstone is a diamond when it is in fact a cubic zirconium). In each case, the defendant has lied about the nature of the bargain and thus in both cases the defendant has committed wire fraud. But if a defendant lies about something else-e.g. , if he says that he is the long-lost cousin of a prospective buyer-then he has not lied about the nature of the bargain, has not "schemed to defraud," and cannot be convicted of wire fraud on the basis of that lie alone.
Id. at 1314. In other words, we concluded, "even if a defendant lies, and even if the victim made a purchase because of that lie, a wire-fraud case must end in an acquittal if the jury nevertheless believes that the alleged victims received 'exactly what they paid for.' " Id. at 1315 (quoting United States v. Shellef , 507 F.3d 82, 108 (2d Cir. 2007) ). And we identified this interpretation with a line of caselaw from the Second Circuit, see id. at 1314-15 (citing Shellef , 507 F.3d 82 ; United States v. Starr , 816 F.2d 94 (2d Cir. 1987) ; United States v. Regent Office Supply Co. , 421 F.2d 1174 (2d Cir. 1970) ), that appears to have originated in concerns about materiality, see Regent Office , 421 F.2d at 1182 (reversing the defendants' convictions because "the falsity of their representations was not shown to be capable of affecting the customer's understanding of the bargain nor of influencing his assessment of the value of the bargain to him").
*1269 Our analysis is difficult to ground in the common law of fraud. To begin with, our failure to discuss the common law makes it hard to be sure precisely which traditional fraud elements, if any, we thought we were interpreting. Even so, making sense of Takhalov requires that we at least attempt to relate its conclusions in Part II.A.1 to some aspect of the traditional legal definition of fraud. The proposition that the phrase "scheme or artifice to defraud" contains some limitation with absolutely no roots in the common-law definition of actionable fraud is a nonstarter. After all, we must presume that "Congress intend[ed] to incorporate the well-settled meaning of the common-law terms it use[d]" " 'unless the statute otherwise dictates.' " Neder , 527 U.S. at 23, 119 S.Ct. 1827 (quoting Nationwide Mut. Ins. Co. v. Darden , 503 U.S. 318, 322, 112 S.Ct. 1344, 117 L.Ed.2d 581 (1992) ). And our opinion in Takhalov does not so much as suggest that its analysis follows from some peculiarity of the wire-fraud statute that "dictates" a narrower interpretation of "defraud" than the common law would warrant. On the contrary, we believed that our discussion "follow[ed] as a matter of logic" from the word "defraud" itself. 827 F.3d at 1315 ; see also id. at 1313-14 (interpreting the word "defraud"). So, for Part II.A.1 of Takhalov to make sense, it must mean that one or more of the traditional elements restrict the common-law meaning of fraud "to those schemes in which a [party] lies about the nature of the bargain itself," "primar[il]y" by "l[ying] about the price" or "about the characteristics of the good." Id. at 1314.
The trouble is that none of the traditional fraud elements is a natural fit with our discussion in Part II.A.1. The most basic two elements, misrepresentation and scienter, are prima facie implausible candidates to be the subject of our analysis. To be sure, as I have discussed, the jury instruction that the defendants requested easily could be read to highlight the important difference between mere nondisclosure and potentially actionable misrepresentation. But in Part II.A.1, our analysis of the phrase "scheme or artifice to defraud" assumed the existence of "a scheme to deceive ," id. at 1313, and a defendant who "ha[d] lied," id. at 1314. The evident point of our discussion was to distinguish between those deliberate misrepresentations that may constitute a scheme to defraud-"lies about the nature of the bargain"-from those deliberate misrepresentations that cannot constitute such a scheme-"lies about something else." Id. It seems unlikely that we were considering what constitutes a deliberate misrepresentation in the first place.
It also seems unlikely that we were discussing the requirement that the defendant intend to influence the victim into relinquishing some property right. True, as I have explained, much of our opinion suggests that the defendants may have intended the customers to rely on the B-girls' concealment of their employment status only in deciding to visit the clubs and not necessarily in deciding to order drinks once they were there. But our analysis in Part II.A.1 undermines this suggestion. Our statement about "a schemer who tricks someone to enter into a transaction"-who, we reasoned, "has not 'schemed to defraud' so long as he does not intend to harm the person he intends to trick"-is most naturally read to refer to a schemer who intends to bring about a transaction by means of deceit. Id. at 1313. In the same vein, a salesman who "says that he is the long-lost cousin of a prospective buyer" presumably does so because he thinks it will facilitate a sale. Id. at 1314. But we stated that the salesman "cannot be convicted of wire fraud on the basis of *1270 that lie alone," implying that some other element of fraud must be lacking. Id.
So the two most plausible ways of translating our conclusion that a "scheme or artifice to defraud" requires a misrepresentation "about the nature of the bargain itself" into common-law terms concern the elements of injury and materiality. On the injury-based reading, the thesis of Part II.A.1 is that the harm of having been tricked into a transaction, while still understanding its essential terms, is not an injury that would make fraud actionable at common law; that is, a fraudulent inducement does not "wrong[ ] [the victim] in his property rights," Hammerschmidt , 265 U.S. at 188, 44 S.Ct. 511, in the sense required for a successful fraud claim or a conviction under a criminal-fraud statute. Alternatively, on the materiality-based reading, Part II.A.1 means that a lie about something other than "the nature of the bargain" is necessarily immaterial or, put another way, that to enter a transaction in reliance on such a lie is necessarily unreasonable or unjustifiable. See Svete , 556 F.3d at 1164 ("As both the modern and ancient authorities on the common law cited by the [ Neder ] Court explain, materiality was understood to be a component of reasonable reliance at common law." (collecting authorities)).
Although each of these interpretations of Part II.A.1 has some plausibility, they are plausible for different reasons, and the strength of each is the other's weakness. The injury-based reading is plausible to the extent that it seems to match our reasoning . After all, we began with the premise that "to defraud , one must intend to use deception to cause some injury" or, put another way, "intend to harm the person [one] intends to trick." Takhalov , 827 F.3d at 1313. But the injury-based reading makes less sense of our conclusion , which distinguished fraudulent from nonfraudulent lies based, not on their consequences , but on their subject matter . See id. at 1314 (distinguishing fraudulent lies "about the price" or "the characteristics of the good" from nonfraudulent "lies about something else"). Conversely, the materiality-based reading makes better sense of our conclusion-distinguishing lies based on their subject matter is what the materiality element has always done, see Prosser and Keeton on Torts § 108, at 753-54-but it finds little if any direct support in the reasoning of Part II.A.1. Indeed, to make matters more confusing, elsewhere in the opinion we seem to have taken it for granted that "the B-girls' relationship to the clubs" was "a material fact." Takhalov , 827 F.3d at 1323. But see id. at 1311-12 (arguably suggesting that the jury instruction concerned materiality).
Whichever reading one prefers, the overriding problem is that both the injury-based reading and the materiality-based reading are incompatible with the common law and with binding precedent. So-called "fraud in the inducement"-that is, fraud about a collateral but still material matter that persuades a victim to enter a transaction he would otherwise have avoided-has long been considered a species of actionable fraud. Nor is materiality limited to the "nature of the bargain" representations we discussed in Takhalov . I address these problems in turn.
The common law has traditionally distinguished between two kinds of fraud: "fraud in the factum" and "fraud in the inducement." See, e.g. , Lovato v. Catron , 1915-NMSC-021, ¶ 7, 20 N.M. 168, 148 P. 490, 492. "Fraud in the factum" refers to fraud that deceives the victim about the nature of the act or transaction-for example, "the sort of fraud that procures a party's signature to an instrument without knowledge of its true nature or contents."
*1271 Langley v. Fed. Deposit Ins. Corp. , 484 U.S. 86, 93, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987). By contrast, "[f]raud in the inducement exists where the defrauded party understands the identity of the adversary party, the consideration, the subject-matter, and the terms of the contract, and he is willing to enter into [it]; but his willingness so to enter is caused by a fraudulent misrepresentation ... as to a material fact." 1 Page on Contracts § 281, at 435. Although fraud in the factum and in the inducement have different legal consequences-most significantly, fraud in the factum "makes the underlying contract void ab initio , whereas ... fraud in the inducement only makes [it] voidable," Solymar Invs., Ltd. v. Banco Santander S.A. , 672 F.3d 981, 994 n.13 (11th Cir. 2012) (citation omitted)-jurists have never hesitated to call both by the name of "fraud."
Fraud in the inducement fits squarely within the "well-settled meaning" of "actionable 'fraud.' " Neder , 527 U.S. at 22, 119 S.Ct. 1827. It can support a claim for damages. See 37 Am. Jur. 2d Fraud and Deceit §§ 2, 270, at 28, 316 ; see also Gregg v. U.S. Indus., Inc. , 715 F.2d 1522, 1541 (11th Cir. 1983) (applying Florida law). And it can serve as a defense to a claim. See 37 Am. Jur. 2d Fraud and Deceit § 368, at 407 ("Fraud in either the inducement or the factum ... may be established as a defense to a claim prosecuted by the person guilty of fraud."); 1 Page on Contracts § 341, at 544-45 & n.2 (collecting decisions); see also Wagner v. Nat'l Life Ins. Co. , 90 F. 395, 404 (6th Cir. 1898).
So, if our analysis in Takhalov means that the federal fraud statutes punish only fraud-in-the-factum schemes, not schemes to commit fraud in the inducement, it is at odds with the common law. That fraud in the inducement has traditionally been actionable reflects the law's judgment that a person is "entitled to determine on what basis, for what reason, and under what circumstances [he] want[s] to give away" his property. Gregory v. United States , 253 F.2d 104, 109 (5th Cir. 1958). As Judge Learned Hand explained nearly a century ago, "[a] man is none the less cheated out of his property, when he is induced to part with it by fraud, because he gets a quid pro quo of equal value." Rowe , 56 F.2d at 749. "[H]e has suffered a wrong; he has lost his chance to bargain with the facts before him." Id. The Supreme Court has since confirmed Judge Hand's wisdom. See Shaw v. United States , --- U.S. ----, 137 S. Ct. 462, 467, 196 L.Ed.2d 373 (2016) (quoting and endorsing Rowe , 56 F.2d at 749 ).
Unsurprisingly, this reading of Takhalov is also at odds with our precedent. To be sure, we have never expressly held that the phrase "scheme and artifice to defraud" covers fraud in the inducement as well as fraud in the factum-the argument that it covers only the latter has never been made or at least not in those terms-but our precedents reflect a clear understanding that it covers both. Take, for instance, United States v. Dynalectric Co. , 859 F.2d 1559 (11th Cir. 1988), in which we held that an indictment charging a bid-rigging scheme for government contracts stated a "scheme or artifice to defraud," see id. at 1572, and that the evidence supported the convictions of the schemers, see id. at 1574-76. The defendants submitted fraudulent bids, which the government relied on when it selected the lowest bidder. See id. at 1562. But the defendants did not deceive the government about the cost of the lowest bid or the work that the winning bidder would complete. See id. The gravamen of the scheme to defraud, in other words, was not any misrepresentation about "the price" or "the characteristics of" the bargained-for work. Takhalov , 827 F.3d at 1314. Instead, it was a set of "lies about something else," id. -namely, that the bids were the product of competition, *1272 not collusion-intended to trick the government into entering a contract that otherwise it either would have avoided or would have negotiated on different terms.
Part II.A.1 of Takhalov fares no better if interpreted as a commentary on materiality. It is hornbook law that the test of materiality "cannot be stated in the form of any definite rule, but must depend upon the circumstances of the transaction itself." Prosser and Keeton on Torts § 108, at 753. In the circumstances of a particular transaction, a misrepresentation is material either if a reasonable person would consider it important to his choice of action or if its maker knows that its recipient would likely do so. See Neder , 527 U.S. at 22 n.5, 119 S.Ct. 1827 (quoting Restatement (Second) of Torts § 538(2) ); Svete , 556 F.3d at 1164 (same); accord Restatement (Second) of Contracts § 162(2) ; Prosser and Keaton on Torts § 108, at 753-54; 1 Page on Contracts § 308, at 481-82 ("[I]t is usually held that [material representations] are all representations which ... tend to induce the party to whom they are made, to enter into the contract."); 1 Story, Commentaries on Equity Jurisprudence § 195, at 204 (equating materiality with "inducement or motive to the act or omission of the other party").
Nothing about the common-law test limits materiality to misrepresentations about "the price," "the characteristics of the good," or even "the nature of the bargain itself." Takhalov , 827 F.3d at 1314. The phrasing of the test by the authorities suggests as much, the actionability of fraud in the inducement implies it, and a couple of common-law examples confirm it. If a parent declines to enroll his child at a school unless her classmates from a previous school have also enrolled there, the school's misrepresentation to the parent that they have done so is material, even though it does not concern the price of tuition or the characteristics of the instruction. Brown v. Search , 131 Wis. 109, 111 N.W. 210, 211 (1907). And if a vendor of portraits lies to a prospective buyer that members of the buyer's family have seen the portraits and like them, that lie too is material, notwithstanding that the buyer knows the price and characteristics of the goods. Washington Post Co. v. Sorrells , 7 Ga.App. 774, 68 S.E. 337, 337 (1910).
The common-law courts that decided Brown , Sorrells , and many similar cases, see Prosser and Keeton on Torts § 108, at 753-54 & nn.45-60, also would not have held that a seller's pretense "that he is the long-lost cousin of a prospective buyer" cannot be material as a matter of law, Takhalov , 827 F.3d at 1314. On the contrary, it has long been established that "the identity of an individual" may be a material fact, provided-as always-either that it would be likely to influence a reasonable person or that the maker of the statement knows it would be likely to influence the recipient. Prosser and Keeton on Torts § 108, at 753; see also 1 Page on Contracts § 260, at 390 ("Such identity is material where the personality of the adversary party is a factor in inducing the one party to enter into the contract ...."). And our binding circuit precedent agrees. See Walker v. Galt , 171 F.2d 613, 614 (5th Cir. 1948) ("[F]raud may be predicated upon misrepresentations as to the identity of the purchaser ..., where the vendor would not have entered into the contract had he known the true identity of the purchaser." (quoting 55 Am. Jur. Vendor and Purchaser § 96 (1946) )); see also United States v. Bent , 707 F.2d 1190, 1193 (11th Cir. 1983) ("We are bound by decisions of the former Fifth Circuit rendered prior to October 1, 1981, and by decisions of Unit B of the former Fifth Circuit rendered after that date." (citation omitted)). In short, if our discussion in Part II.A.1 of Takhalov interpreted the materiality element *1273 of actionable fraud, it is at odds with the traditional understanding of materiality and with the understanding reflected in our precedent.
So, on examination, the two most plausible ways of translating the analysis of Part II.A.1 into the language of the common law turn out to be doctrinal dead ends. Where does this leave us in our attempt to make sense of Takhalov ? The connection between the jury instruction requested by the defendants, on the one hand, and the reasoning that occupies much of our opinion, on the other, is less than transparent. And the connection between that reasoning and the preexisting jurisprudence of fraud is even more obscure. To my mind, all that is clear is that the Takhalov panel held that the district court should have given the jury instruction and that its failure to do so was reversible error. The rationale for that decision remains an enigma.
In the light of these concerns, I encourage the bench and bar to evaluate carefully the precedential value of Takhalov in future prosecutions under the fraud statutes and, in doing so, to keep three principles in mind. First, the binding force of a precedent is limited to its holding, and "regardless of what a court says in its opinion, the decision can hold nothing beyond the facts of that case." Edwards v. Prime, Inc. , 602 F.3d 1276, 1298 (11th Cir. 2010) (emphasis added) (collecting decisions); see also United States v. Johnson , 921 F.3d 991, 1003 (11th Cir. 2019) (en banc); New Port Largo, Inc. v. Monroe County , 985 F.2d 1488, 1500 & n.7 (11th Cir. 1993) (Edmondson, J., concurring in the judgment). Second, the holding of any panel decision must be construed, "if at all possible," in a manner that maintains the harmony of our precedents. United States v. Hogan , 986 F.2d 1364, 1369 (11th Cir. 1993). Third, even the holding of a panel decision is not binding precedent if it contradicts the holdings of earlier panel precedents or intervening decisions of the Supreme Court. See United States v. Dailey , 24 F.3d 1323, 1327 (11th Cir. 1994) ; see also Bryan A. Garner et al., The Law of Judicial Precedent § 36, at 304 (2016).
Notwithstanding my concerns about the reasoning of Takhalov , I do not mean to imply doubt about the correctness of its result. Perhaps the B-girls' representations about their employment status were immaterial to the customers' drink orders for some more precise reason than that they were not "about the price" or "the characteristics of the [drinks]." Takhalov , 827 F.3d at 1314. Or perhaps some other element of common-law fraud was lacking. In the last analysis-that is to say, in the light of our precedents and all that we know about the well-settled legal meaning of the word "defraud"-it may even be that Takhalov is best understood to rest on the distinction between misrepresentation and mere nondisclosure or on the hypothesis that the defendants intended for the B-girls' concealment of their employment status to influence customers only by getting them in the door, not by inducing them to order drinks. True, either of those interpretations would render most of Part II.A.1 dicta. But a reading that makes dicta of large swaths of Takhalov is preferable to one that cannot be squared with preexisting doctrine. See Hogan , 986 F.2d at 1369 (We are "obligated, if at all possible, to distill from apparently conflicting prior panel decisions a basis of reconciliation and to apply that reconciled rule.").
In any event, we need not crack the riddle of Takhalov to resolve this appeal, and I express no ultimate opinion about its solution. But our analysis could have been much clearer had we only anchored it in the common-law meaning of the term Congress *1274 used when it enacted the federal criminal-fraud statutes.